123 N.J. Super. 152 (1972)
301 A.2d 789
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM R. HIBBS, III, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Mercer County Court.
Decided September 27, 1972.
*153 Mr. Bruce M. Schragger, Mercer County Prosecutor, attorney for the State (Mr. Gerald A. Hughes, Assistant Prosecutor, appearing), on behalf of the State of New Jersey.
Messrs. Dietrich, Mancino & Allen, attorneys for defendant (Mr. Charles P. Allen, appearing).
Mr. Joseph Hoffman, appearing on behalf of New Jersey Bell Telephone Co.
MOORE, J.S.C.
Defendant was convicted in the Ewing Township Municipal Court for a violation of the provisions of N.J.S.A. 2A:170-29(3) in that he had made obscene telephone calls to two women on various dates. The conviction was affirmed on appeal to the County Court, and an appeal was subsequently taken and argued before the Appellate Division on December 14, 1971 and decided January 14, 1972, 123 N.J. Super. 108. In the Appellate Division's decision the matter was remanded back to the County Court for the purposes as stated in the decision.
Since this is the first instance in which the reliability of such equipment has been subjected to court scrutiny, and in view of its probable future importance in detecting criminals, we remand to the County Court for further testimony by the State and defendant solely on the issue of the reliability of the tracing equipment.
The initial hearing for the purpose of taking testimony was conducted on February 28 and 29, 1972. At that hearing witnesses were presented on behalf of the State; however, by agreement between counsel, cross-examination was postponed until a subsequent date and after a transcript of the State's witnesses had been prepared and defense attorney would have an opportunity to discuss that testimony with his expert witnesses. The transcript in the matter was finally *154 forwarded to the court on June 19, 1972. The earliest convenient date for all parties and witnesses for the hearing to continue was August 1, 1972. The hearing was conducted on that date and on August 2, at which time cross-examination was concluded and expert witnesses on behalf of the defendant were presented and subjected to cross-examination by the State. A transcript of the proceedings of August 1 and 2 has been ordered; however, the same has not been completed to date.
The State called as witnesses Robert H. Galbraith, Security Manager, N.J. Bell Telephone Co., and Mr. Douglas M. Harlow, a member of the technical staff in the Station and Studies Department of the Bell Telephone Laboratories, located in Holmdel, N.J. Both of these men were well qualified in the telephone communications field with extensive practical experience in the telephone industry.
The telephone system in New Jersey is basically divided into central offices which take care of specifically designated areas and all telephone service in that specific area uses the one central office for making connections from one caller to another. The central office is usually identified by the first three digits of a telephone number, such as 292-4636 or 392-2965. In the case before the court we are dealing with central office 882, which encompasses parts of Trenton and Ewing Township, central office 298, Bordentown, N.J., and central office 393, Trenton. These three central offices have two different types of equipment. Central office 882 and central office 298, the Ewing and Bordentonwn offices, have equipment that is known as No. 5 Crossbar, this name being derived from the type of switch used in the specific central office. It is a device that has 20 paths out of it horizontally and 20 paths out of it vertically and where the horizontal paths and the vertical paths cross you get the crossbar because to operate the contacts that make the telephone connection there is a bar. The number 5 merely means it is the fifth design using a crossbar switch for a local central office. At the present time in the N.J. Bell system they use only the No. 1 *155 crossbar and the No. 5 crossbar. Numbers 2, 3 and 4 were never used in the system, but were experimental in nature. The central office 393, Trenton, is more commonly known as an E.S.S. office, meaning electronic switching system. This type of installation performs the same services as that of a No. 5 crossbar office, that is, the purpose of the E.S.S. system is to connect telephone subscribers with their calling number. The E.S.S. system can be compared to a large computer and it is a completely solid state electronic system, whereas the No. 5 crossbar is electro-mechanical. The E.S.S. system is basically two units in one, that is, the operating unit is constantly being monitored by a memory bank, so that in the event of major trouble, the system can switch over to the monitoring unit without any delay. This system also has what is known as a diagnostic test which indicates that when the machine has a few seconds it will routine itself automatically. Of course, being a computer type system, there is a teletype machine used to talk to the computer, and the teletype machine is capable of answering the various questions put to it.
Both of these systems perform basically the same function. When a telephone subscriber dials a number the equipment in the central office, whether it be a number 5 crossbar or an E.S.S. office, picks up that number, identifies the various numbers dialed, and if the number dialed is within the same central office, it automatically connects the caller with the calling number, the connection is made and the called number's phone begins to ring. This, of course, happens within a matter of seconds, the equipment in the central offices being capable of identifying and connecting called numbers within extremely short periods of time, all automatically. In the event that the subscriber is dialing a number not within his own central office area, the subscriber's central office identifies the central office number that the subscriber had dialed, and through a system of trunk lines that connect the various central offices the called number is directed to the central office in which the called number is located. *156 That central office then again goes through the process of identifying the numbers and making the connection within that office so that the telephone connection is made and the phone begins to ring.
In the construction and design of the No. 5 crossbar system the telephone company has developed what is known as a trouble recorder, which is a piece of equipment that does what it says, that is, it records trouble, and it records this trouble on IBM-type cards which, when properly read, indicate to the telephone personnel where the trouble is within the particular system. This equipment is designed to indicate to the maintenance men within the central office when there is trouble on a particular line, or when a particular number is out of order. The system is also used to verify when new phones are installed, that is, when the maintenance men within the central office make a new connection for a new subscriber and make the manual connections of the specific telephone line within the central office, the personnel can dial that number and the trouble recorder would indicate whether the proper manual line connections have been made or not. The IBM card prints out the telephone number of the phone from which the call is made and also prints out the number that was dialed, and when properly connected, the IBM card would verify that the proper connections have been made and the new subscriber's phone can be placed in service.
The N.J. Bell System being aware that this information could be obtained from the trouble recorder, modified this piece of equipment and used it for line identification in their annoyance call program, this program having been put in effect in 1965. The telephone company had for sometime prior to that date been concerned with doing something about its subscriber's complaints regarding annoyance calls, and the annoyance call program instituted in 1965 was a result of its various studies and ideas. What is basically done in the annoyance call program is that when a subscriber makes a complaint relative to an annoyance call, a detector *157 circuit is placed on the subscriber's telephone line in the central office. Such a detector does not in any way interfere with the making or receiving of telephone calls and it in no way monitors any of the telephone calls made or received. The detector's circuit is connected with the trouble recorder so that every time the subscriber receives a telephone call a card is printed indicating the number making the call to the subscriber if both numbers are within the one central office. If the calling number is outside of the subscriber's central office, the print-out card will indicate the central office number from which that call was made. Of course, in this type of program the subscriber who has made the complaints is requested to maintain a log of the calls received and the time they were received, so that if an annoyance call is received, the subscriber will have the time and the date and can relay that information to the telephone company which, in turn, would locate the card indicating the call that was made at that time and thus have the information as to the number or central office making the call.
As was indicated, if the complaining subscriber and the annoyance caller are located within the same central office, the job of tracing the call is relatively simple since both numbers would appear on the print-out card. Of course, the telephone company, using its own information, would be able to determine the specific location of that annoyance caller. In the event that the annoyance caller is using a phone that is located in another central office, then it requires the additional assistance of the second central office to again put a detector circuit on the trunk line so that the trouble recorder in the second central office would record all calls going to the complaining subscriber's central office. And again, using the log kept by the complaining subscriber, the time that the annoyance call was made can be checked with the card, and the number from which the annoyance call was made would be on the second central office's card. The second central office would then take the additional step of placing a detector circuit on the phone number indicated *158 within that office, so that if another annoyance call was made from that specific number to the complaining subscriber both central offices would have the information on their recorded cards indicating the telephone number making the call and the number which was dialed, and with such a match the annoyance call has been traced.
Such a system requires a number of annoyance calls in order to obtain a line verification match. You, of course, would have the initial call to the subscriber on which the complaint is made. A second call would have to be made after the detector circuit had been installed on the subscriber's line, and if both numbers are within the same central office this is all the verification that is necessary, except that in some instances a detector circuit could be placed on the phone from which the annoyance calls are being made and upon the next annoyance call being made there would be a card punched out for both the call being made by the annoyance caller and a card punched out when the connection was made with the complainnig subscriber's number. In the event that the annoyance call was made from another central office, then a third call would have to be made after the detector circuit had been connected to the trunk line at the second central office, and on this third call there would be a verification made. However, this could be taken one step further and a detector circuit attached to the phone of the annoyance caller, and if a fourth call was made there would be a card printed in both central offices indicating the call made by the annoyance caller and the call received by the complaining subscriber.
As was indicated, the above examples deal with Number 5 Crossbar central offices, and when dealing with an E.S.S. central office the line verification match is simplified because of the sophistication of the equipment being used. In the E.S.S. office the teletype machine tells the computer the number that is to be verified and the computer then prints out the information when the annoyance call is made. As with the crossbar central office, if the annoying caller and *159 the complaining subscriber are located within the same E.S.S. central office, one call would be sufficient to make a verification. However, a second verification could be made by indicating to the computer a check on the annoyance caller's phone, and if a second call is made, the full information would be printed out on the teletype. If the calls are from two separate central offices, whether they be two E.S.S. offices or an E.S.S. office and a Crossbar office, the same procedure can be followed that is outlined above and verification of the calls are made through the print-out card or the teletype machine.
The witnesses for the State testified in great detail regarding the operations of their annoyance call program and the accuracy of such a program as would be indicated by the use of the same equipment in their trouble recording operations. S-6 was introduced into evidence which gives a general outline of the problems encountered in the operation of the telephone system and the percentage of those problems arising through equipment failures, etc. Using these figures as a basis, the witnesses indicated that the possibility of error in the verification of annoyance calls is minute and the probability of error nonexistent. Both witnesses accordingly testified that in their opinion the system was accurate and reliable in the detection of annoyance calls and the verification of the phone number from which the calls are being made to the complaining subscriber's number.
At the hearing held on August 1 and 2 defense counsel was given the opportunity of cross-examination of plaintiff's witnesses. He also presented witnesses on defendant's behalf. Michael Rappaport, a statistician with the Opinion Research Corporation, testified. He indicated that he had been employed by the Bell Telephone Laboratories for a period of ten years and further, had worked with the computers at the Bell Lab for study purposes and was familiar with the No. 5 Crossbar system. Rappaport's testimony basically was to the effect that he did not find that the information contained on exhibit S-6 was complete enough to make an accurate *160 determination as to error within the system. However, he did testify that the annoyance call program was reliable, but he doubted its reliability on only one phone call, and he further indicated that there was always a possibility of error. The courts, of course, do not deal in possibilities but in probabilities. The court is of the opinion that Rappaport's testimony in essence agreed with that of the state's witnesses in that he indicated the verification system was reliable and that the equipment used was reliable.
The defense also called Louis Lavine, Assistant Director of Analytical Studies and Services at the Educational Testing Service, where he had been employed for a period of four years. The basis of his testimony was that all systems, no matter how thoroughly designed, such as the E.S.S. system, had some design error. However, in his experience with the Philco company he found that he observed errors in their computer-type machines only on rare occasions, and he indicated that heat, moisture and electrical interference could possibly affect the accuracy of a computer-type system such as E.S.S. Lavine's testimony was of a more general nature and did not deal with specifics in that he had never observed a No. 5 Crossbar system in operation. Nor had he observed an E.S.S. system or know what an E.S.S. system was composed of. He indicated that the basis of his testimony was given as a result of his review of the transcripts of the proceedings of February 28 and 29. However, he did indicate that from his experience it was his opinion that most computers were reliable.
The State called a rebuttal witness, Richard Haenni, who is employed by the Bell Telephone Company as a central office maintenance supervisor. He testified as to the methods by which the telephone company controls the heat and moisture in its central offices and also deals with the problem of electrical interference. This testimony was such that the court finds that as the system is constructed and maintained, the accuracy of the verification of annoyance calls is not affected by heat, moisture or electrical interference.
*161 The court has considered the testimony offered by the various witnesses. It has also taken into consideration the fact that the court, together with the attorneys, made an on-site inspection of the No. 5 Crossbar central office 882, Trenton and Ewing, and also the E.S.S. central office 393, Trenton, where actual tests were made and recording cards printed when the court made specific telephone calls to lines upon which a detector circuit had been placed. The cards, when read, indicated the number from which the court was calling and the number that was dialed, as well as the time the call was placed. The same test was made in the E.S.S. office and an additional test was made by dialing a number from the E.S.S. office to the No. 5 Crossbar central office in Ewing Township, and a similar verification was made on that test. The court therefore finds that the tracing equipment used by the N.J. Bell Telephone Company, more accurately described as line verification match, as used in the annoyance call program of the company, is reliable and accurate and that the probability of error in such verification is, for the court's purposes, nonexistent.