610 F.2d 1148
 58 A.L.R.Fed. 704
 In the Matter of the Application of the UNITED STATES OF
AMERICA FOR an ORDER AUTHORIZING the INSTALLATION
OF a PEN REGISTER OR TOUCH-TONE DECODER
AND a TERMINATING TRAP.
Appeal of BELL TELEPHONE COMPANY OF PENNSYLVANIA.
In the Matter of the Application of the UNITED STATES OF
AMERICA FOR an ORDERAUTHORIZING the INSTALLATION
OF a PEN REGISTER OR a TOUCH-TONE
DECODER ANDTERMINATION TRAP
FACILITIES.
Appeal of BELL TELEPHONE COMPANY OF PENNSYLVANIA.
In the Matter of the Application of the UNITED STATES FOR AN
ORDER AUTHORIZINGA TELEPHONE TRACER.
Appeal of NEW JERSEY BELL TELEPHONE COMPANY.
 Nos. 78-2574, 78-2550 and 79-1127.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 7, 1979.
Decided Nov. 29, 1979.
 
 Donald L. Very (argued), Richard B. Tucker, III, Tucker, Arensberg, Very & Ferguson, Pittsburgh, Pa., William M. Hebrank, Philadelphia, Pa., for Pennsylvania Bell Telephone Co.
 Bernard M. Hartnett, Jr., Thomas E. Walsh, Jr. (argued), Newark, N. J., for New Jersey Bell Telephone Co.
 Robert J. Cindrich, U. S. Atty., J. Alan Johnson (argued), First Asst. U. S. Atty., James J. West, Asst. U. S. Atty., Pittsburgh, Pa., Robert J. Del Tufo, U. S. Atty., Daniel L. Rabinowitz (argued), Asst. U. S. Atty., Newark, N. J., for United States.
 Before SEITZ, Chief Judge, and GIBBONS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 These appeals raise the issue of a district court's authority to order a telephone company to assist law enforcement agents in the tracing of telephone calls. The Supreme Court has ruled that a district court may require telephone company assistance in the case of a pen register. United States v. New York Telephone Co., 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). A trace, like a pen register, decodes the signals sent out by the dialing of a telephone, but it serves an opposite function. Rather than identify the destination of calls made from a known telephone, it identifies the source of calls made to a telephone. Moreover, the execution of a trace may require a more extensive and more burdensome involvement on the part of the phone company. We now must decide how the principles developed in the pen register case apply to tracing orders.I.
 
 A.
 
 2
 Each of the three appeals arose from similar circumstances. A federal law enforcement agency had uncovered gambling enterprises operating in violation of federal law. It discovered that participants regularly received telephone calls as part of the operations and wished to trace these calls for the purpose of identifying other participants. The federal agents then sought warrants from the district court authorizing the traces. In support of the request, they filed affidavits asserting probable cause to believe that the telephone was being used to violate federal criminal laws and that a trace could lead to the identification of persons committing the crimes. In addition, they requested an order compelling the local telephone company to provide the technical means for the trace. The district court considered the request in an ex parte proceeding.
 
 
 3
 The order in the first case concerned an investigation of gambling in western Pennsylvania. On September 5, 1978, the district court for the Western District of Pennsylvania issued a warrant permitting agents of the Federal Bureau of Investigation to install a pen register and tracing equipment on a particular telephone and to monitor calls made to and from the telephone for ten days. In addition, the court ordered the Bell Telephone Company of Pennsylvania to "furnish all information, facilities, and technical assistance necessary to accomplish the assistance unobtrusively with a minimum of interference with the service that such carrier is providing."[1] In a supplemental order issued three days later, the district court elaborated upon the assistance required of Pennsylvania Bell. The court ordered the company to install and continually operate "card drops and other mechanical or electrical devices." When the FBI requested, the company was to "perform manual tracing operations to the extent technically feasible." Finally, the order required the company to turn over to the FBI all information gathered by the traces.
 
 
 4
 Immediately upon receipt of the orders, Pennsylvania Bell moved, under Fed.R.Crim.P. 47, to set aside the provisions requiring traces. The court held an evidentiary hearing on September 15, 1978, at which it heard one of Pennsylvania Bell's equipment engineers describe the technical requirements of tracing. After considering this testimony and the arguments of the company's counsel, the court denied the motion. Pennsylvania Bell already had carried out the traces required by the order, and after its motion failed, it turned the results over to the FBI.
 
 
 5
 On October 11, 1978, the Western District of Pennsylvania issued the second order now before us. The order authorized the FBI to install and operate a pen register and directed Pennsylvania Bell to provide the necessary technical assistance. It also directed the company to "(u)tilize electrical devices (Electronic Switching System ESS) to trap and trace incoming calls to the extent technically feasible" and to perform traces "only when specifically requested" by the FBI. The order permitted monitoring of calls for twenty days. Finally, the company was to turn the results of traces over to the FBI.
 
 
 6
 Pennsylvania Bell again moved to set aside the tracing provisions of the order. By stipulation, the parties agreed to incorporate into the record for this motion the testimony and evidence produced at the September 15 hearing. Without any further proceedings, the court denied the motion.
 
 
 7
 The third order in this appeal was issued in the District of New Jersey on November 13, 1978, on behalf of agents of the Criminal Investigation Division of the Internal Revenue Service. The order granted authority for up to twenty days to "(t)race to the source certain telephone calls received by" a certain telephone. It further directed New Jersey Bell Telephone Company to furnish the IRS agents upon their request "with all information, facilities and technical assistance necessary to accomplish the tracing . . . unobtrusively." The order provided for compensation of New Jersey Bell "at the prevailing rates."
 
 
 8
 As its Pennsylvania counterpart had done, New Jersey Bell immediately moved to have the order set aside. The district court held an evidentiary hearing on December 1, 1978, at which it heard the testimony of one of New Jersey Bell's equipment engineers. The court then denied the motion. During the course of the district court's consideration of the motion. New Jersey Bell had executed the traces requested by the IRS. After the failure of its motion, the company turned the results over to the IRS.
 
 B.
 
 9
 Most of the testimony in the district courts concerned the technical requirements of tracing a call.[2] The dialing of a telephone sends out electronic impulses that direct the telephone company's switching equipment to connect the lines of the calling and receiving numbers. The switching equipment for all of the telephones in a single locality or urban neighborhood is housed in a single central office. The steps required for a trace will vary with two factors: the type of equipment in a central office and whether the calling and receiving numbers are served by the same or a different central office.
 
 
 10
 The most advanced switching equipment is known as the electronic switching system (ESS). It matches telephone numbers through a form of computer search. Tracing calls on ESS is relatively simple, because the equipment has a computer-like memory which can record the source of calls made to any number. If a call is placed from a telephone served by the same central office, the trace will identify that telephone. If not, it will identify the trunk line that carried the call from another central office. The telephone company can program the ESS equipment either prior to the time at which a call is expected or while a call is in progress. The in-progress trace must be completed before the caller hangs up. Because typing the program into the equipment takes less than one minute, in-progress traces generally present no difficulties.
 
 
 11
 A less advanced switching system is known as electro-mechanical or cross-bar switching. This system forms a circuit between two telephones by means of a direct mechanical link. If the telephone company is able to prepare in advance for a trace, it can simplify the process by attaching to the equipment a device known as a terminating trap. This device will signal to another machine whenever a call to a particular number is in progress. With the latest generation of this equipment, no. 5 cross-bar, the second machine will produce a computer card that records either the number of the telephone that placed the call or the trunk line that carried the call from another central office. With the earlier generation, no. 1 cross-bar, the second machine will not produce a card or any other permanent record of the source of the call. A craftsman must stand by and record the information while the call is in progress. For various technical reasons, a terminating trap often will fail to trace a call successfully.
 
 
 12
 In any other situation, a trace requires a skilled craftsman to manually track the call through the several circuits over which it travels in the central office. A manual search would be necessary if a central office with cross-bar equipment has not installed a terminating trap in advance of the trace. It would also be necessary in the case of a central office with equipment less advanced than ESS or cross-bar. A manual trace will not succeed unless the craftsman completes the trace before the caller hangs up. Because a manual trace takes from ten to fifteen minutes to complete, it is seldom successful.
 
 
 13
 In addition to the foregoing steps, further steps are necessary when a call is placed from a telephone served by a different central office. The initial trace identifies only the trunk line that carried the call. That trunk line might directly connect the two central offices. If this is the case, someone at the receiving office must call a craftsman at the sending office to complete the trace. The steps that must be taken at the sending office will depend upon the type of equipment in that office and whether that office was able to prepare in advance for the trace. When two central offices do not have a direct trunk line connection, calls between them are routed through a tandem office, which is a central office for trunk lines. Tracing through a tandem office must be done manually. The process can add from twenty to thirty minutes to the time needed for a trace and must be completed before a caller hangs up. Such traces are rarely successful.
 
 
 14
 New Jersey Bell operates 258 central offices with switching equipment distributed as follows: 63 use ESS, 156 use no. 5 cross-bar, 18 use no. 1 cross-bar, and 21 use less advanced equipment. Of the 152 central offices that Pennsylvania Bell operates in western Pennsylvania, 22 use ESS and most of the rest use no. 5 cross-bar. Both companies concentrate their most advanced equipment in urban, high density areas.
 
 
 15
 Despite these difficulties, both companies will execute traces for either of two purposes. First, if a customer regularly receives annoying calls and less burdensome measures fail to stop the calls, the company will try to trace the calls and identify the caller. They provide this service free of charge. Second, a craftsman occasionally will use a trace to locate a defect on a particular line.
 
 
 16
 A pen register imposes substantially less of a burden on the telephone company. The company only must identify the pair of wires that serve a particular telephone, direct law enforcement officers to a place where they can obtain a connection with these wires, and lease a line that permits the officers to install and operate a pen register at a remote location. The telephone company does not have to supply or operate any equipment of its own.
 
 
 17
 In each of the three cases now before us, the burden of tracing turned out to be not nearly as great as it might have been. With regard to the first Pennsylvania Bell order and the New Jersey Bell order, the central offices that served the telephones receiving the traced calls used ESS equipment. In neither case were the companies called upon to execute a trace beyond those central offices. The second Pennsylvania Bell order, by its own terms, called only for use of ESS equipment. Therefore, the telephone companies were required to execute nothing more burdensome than simple computer runs.
 
 II.
 
 18
 These cases might appear to be moot since the telephone companies have fully complied with the orders. No decision of this court could remedy any errors that the district courts might have committed. However, we find that the orders fit within the exception to mootness for "short term orders, capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). See also Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 546-47, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Carroll v. Princess Anne, 393 U.S. 175, 178-79, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Nothing indicates that federal law enforcement officials will not continue to seek tracing orders requiring the assistance of these companies. With the very short time period for which tracing orders generally are valid, appellate review of an order prior to its expiration or execution is impossible. Accordingly, we consider appellants' objections on the merits.III.
 
 
 19
 Each of these tracing orders consists of two parts: one part vesting the federal agents with authority to execute traces and another requiring telephone company assistance. The first part rests upon the authority of Fed.R.Crim.P. 41. In New York Telephone Co. v. United States, 434 U.S. 159, 170, 98 S.Ct. 364, 371, 54 L.Ed.2d 376 (1977), the Supreme Court held that a district court's authority to permit searches and seizures under Fed.R.Crim.P. 41 "is sufficiently broad to include seizure of intangible items such as dial impulses recorded by pen registers." The tracing of a telephone call accomplishes the same form of seizure: it records dial impulses. The district court's authority to issue warrants under Rule 41 therefore must extend to tracing warrants.[3] See also Michigan Bell Telephone Co. v. United States, 565 F.2d 385, 389 (6th Cir. 1977).
 
 
 20
 Appellants argue that these orders are invalid as warrants under Rule 41 because they call for execution by the telephone companies. Rule 41 requires that a "warrant be directed to a civil officer of the United States authorized to enforce or to assist in the enforcement of any law thereof." Fed.R.Crim.P. 41(c)(1). Title 18 of the United States Code provides:
 
 
 21
 A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.
 
 
 22
 18 U.S.C. § 3105 (1976).
 
 
 23
 The district court orders, as they are written, plainly direct FBI or IRS agents to execute the traces. These agents are civil officers authorized to execute searches and seizures in the enforcement of federal gambling laws. See United States v. Sigal, 341 F.2d 837, 843-44 (3d Cir. 1965), Cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1966) (IRS); 18 U.S.C. § 3107 (1976) (FBI). The provisions of these orders just as plainly require only assistance from the telephone companies.
 
 
 24
 Appellants argue that the tracing orders cannot be characterized in this manner because the technical procedures of tracing require that telephone company personnel, not federal officers, fully execute the traces. We find this argument unpersuasive in light of the purpose of the rule denying ordinary citizens and corporations the authority to execute search warrants. The rule serves to guard against excessive and abusive use of the extraordinary power to search private premises and seize private property. It restricts the exercise of this power to those officials who are charged with the responsibility for enforcing the criminal laws and who are accountable for their actions. See United States v. Gervato, 474 F.2d 40, 45 (3d Cir.), Cert. denied, 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973). The orders in this appeal are consistent with this purpose. All three direct the telephone companies to perform traces at the specific "order" or "request" of the federal agents. The only possible exception is one part of the first Pennsylvania Bell order, which seems to require the continual operation of ESS and terminating trap equipment to automatically trace calls. In neither case, actions taken at the direction of federal officers or the continual operation of automatic equipment, should the problems associated with private exercise of search and seizure powers arise. The district courts, therefore, acted within their powers under Rule 41.IV.
 
 
 25
 Both district courts based the parts of their orders requiring telephone company assistance on the authority of the All Writs Act:
 
 
 26
 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
 
 
 27
 28 U.S.C. § 1651(a) (1976). The courts issued these assistance orders in aid of their authority under Rule 41 to issue tracing warrants. Appellants argue that the orders were not consistent with the "usages and principles of law" because they imposed excessive burdens on persons not otherwise involved in the matters before the district courts.
 
 
 28
 Once again, United States v. New York Telephone Co., 434 U.S. 159, 171-78, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), presented the same issue in the context of a pen register case. The Second Circuit had disallowed an order requiring telephone company assistance on the grounds that it threatened the autonomy of private third parties. Application of the United States, 538 F.2d 956, 962 (2d Cir. 1976). The Supreme Court agreed "that the power of federal courts to impose duties upon third parties is not without limits," but found the telephone company assistance order proper. 434 U.S. at 172, 98 S.Ct. at 372.
 
 
 29
 From a review of prior applications of the All Writs Act, the Court arrived at the following proposition:
 
 
 30
 The power conferred by the Act extends, under appropriate circumstances, to persons, who though not parties to the action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice . . . .
 
 
 31
 Id. at 174, 98 S.Ct. at 373. The Court found that the telephone company occupied this position. Because it held a monopoly on switching services for a particular telephone, its refusal to assist in the installation of a pen register would frustrate completely the district court's warrant and would obstruct an ongoing investigation of criminal activities. Id. at 174-75, 98 S.Ct. 364.
 
 
 32
 In comparison with this need for assistance, the Court did not find overriding the telephone company's interest in autonomy. Because the district court had found probable cause to believe that the company's facilities were being used for criminal purposes, the company was not completely uninvolved in the matter before the court. The company's status as a highly regulated utility with a duty to serve the public diminished its interest in autonomy. Its use of pen registers for other purposes indicated that it did not regard the use of these devices offensive. Finally, the assistance orders imposed a "meager" burden on the company, requiring "minimal effort" for which the company would be compensated. Id.
 
 
 33
 The telephone companies in the present cases fall within the reach of the district courts' All Writs Act powers because they hold the same ability to frustrate the execution of the courts' warrants and to obstruct criminal investigations. All of the facts that qualified the company's interest in autonomy in New York Telephone, with one exception, are found in this case. The single point of distinction is the potentially greater burden of a tracing order. Cases may arise where a tracing order would impose a burden so severe that the telephone company's interest in its autonomy must prevail. The Supreme Court stated explicitly in New York Telephone that "unreasonable burdens may not be imposed." Id. at 172, 98 S.Ct. at 372. However, in the present cases, evidence produced in the district courts shows that none of the three orders required anything more than traces on ESS equipment. These traces would cause a minimal disruption of normal operations. Moreover, the companies were to be fully compensated. A successful challenge to a tracing order must rest upon a showing of a greater burden than appellants have shown. On the facts of these cases the district courts properly exercised their powers under the All Writs Act in issuing the assistance orders.V.
 
 
 34
 Appellants argue that the assistance orders violated the fifth amendment to the Constitution because the orders constituted a taking of the services of telephone company equipment and personnel without just compensation. Appellants assert this claim despite the inclusion in each of the three orders of a requirement that the telephone company be compensated "at the prevailing rates" for its services.
 
 
 35
 Pennsylvania Bell objects to possible ambiguity in the term "prevailing rates." It fears that the district court might not be willing to provide compensation for many of the losses it has suffered. As Pennsylvania Bell has not yet appealed from any order of the district court denying compensation for any particular items of loss, this objection is premature. We leave to the district court the initial responsibility for deciding the extent of the company's compensable losses.
 
 
 36
 New Jersey Bell states that a prevailing rate does not exist for tracing services. The company does not offer these services to customers for charge, and the state regulatory commission has not set a tariff rate for them. The district court recognized this fact. It gave New Jersey Bell leave to submit evidence to enable the court to determine the appropriate amount of compensation. The company now argues that the task that the district court has undertaken is so complex and so burdensome that the court will not be able to calculate a just amount of compensation. Nothing in the record supports this proposition. We are unwilling to accept as obvious that the court could not, with the aid of ordinary accounting techniques, attach a fair value to New Jersey Bell's services. We therefore reject this argument.
 
 VI.
 
 37
 Appellants' second constitutional objection is more substantial. They argue that the due process clause entitles them to a hearing before the enforcement of a tracing order. The district courts expressed sensitivity to this objection. The court in the Western District of Pennsylvania called the lack of a prior hearing "unusual" and "unfortunate." In the District of New Jersey, the court resolved to allow a hearing before the enforcement of any future tracing orders. Neither court, however, accepted appellants' argument that the lack of a hearing was a constitutional error.
 
 
 38
 The procedural guarantees of due process attach when the state deprives a person of an interest in "liberty" or "property." Board of Regents v. Roth, 408 U.S. 564, 569-72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). We have no difficulty finding a deprivation of a property interest here. The tracing orders denied appellants the free use of their equipment and of the services of their employees, interests to which they are entitled as basic property and contract rights. Although the orders did not completely deprive appellants of these interests, the gravity of a deprivation is irrelevant to the existence of a property interest so long as the deprivation is not De minimis. Goss v. Lopez, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The appellants' losses were not De minimis. Even with a series of ESS traces, the company must for a time forego other uses of its equipment and personnel. We must consider, therefore, whether a prior hearing is among the procedures that due process guarantees in this situation.
 
 
 39
 The most important requirement of due process is the opportunity to be heard at a meaningful time. Fuentes v. Shevin, 407 U.S. 67, 80-84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). The time at which this hearing must occur, like any of the specific dictates of due process, is a function of three factors:
 
 
 40
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.
 
 
 41
 Matthews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). See Mattern v. Matthews, 582 F.2d 248, 254-57 (3d Cir. 1978), Cert. denied, --- U.S. ----, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979).
 
 
 42
 The factor which calls most strongly for a pre-enforcement hearing is the risk of an erroneous deprivation of property rights. As we have stated, the district court should not issue a tracing order that is unreasonably burdensome on the telephone company. The court is not likely to know most of the facts that would make an order too burdensome unless the company informs it of such facts. These facts include the type of switching equipment that will have to be utilized, the number of central offices carrying the calls, what sort of preparations might be possible, and the periods during which telephone company personnel would have to stand ready to execute a trace. Without a prior hearing, a district court is not likely to learn that a tracing order is too burdensome until after the company has carried out the order. A prior hearing could have the further value of allowing the district court to restrict any excessively burdensome order sufficiently to make it valid. Therefore, the only meaningful time for a hearing on a challenge to a tracing order is prior to its enforcement.
 
 
 43
 The contract and property rights which a pre-enforcement order would protect are probably not the most zealously guarded rights in modern due process cases. Compare Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (right of welfare recipients to benefits necessary for subsistence). Nonetheless, these rights are of primary importance to a large business enterprise. Companies should not lose a meaningful opportunity to protect these rights without substantial reason.
 
 
 44
 The only substantial governmental interest in avoiding a pre-enforcement hearing is the interest of law enforcement agencies in executing tracing orders as soon as possible. Delay might seriously obstruct their investigation. However, we cannot find that this interest should completely rule out such a hearing. Considering that law enforcement agents will wish to trace calls over a period of several days, a short delay should not obstruct their efforts greatly.
 
 
 45
 We conclude that due process requires a hearing on the issue of burdensomeness before compelling a telephone company to provide tracing assistance. We will allow the various districts of the circuit to determine for themselves the particular mechanics for providing such a hearing. They may find it helpful to obtain views of counsel for interested parties.
 
 
 46
 In the cases now before us, the companies did not turn over any information to federal agents until the district courts heard and denied their motions. However, they did comply with the assistance orders without the benefit of prior hearings to the extent of programming ESS equipment and executing traces. The district courts erred, therefore, in not providing hearings at a meaningful time.
 
 VII.
 
 47
 The provisions of the district court orders requiring telephone company assistance, except for the provisions entitling the companies to compensation, will be reversed.
 
 
 
 [1]
 This part of the district court's order tracks the language of one section of the wiretap provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(4) (1976). However, the court did not assume, and the parties do not argue, that the Act applies to tracing orders. See Michigan Bell Tel. Co. v. United States, 565 F.2d 385, 387-89 (6th Cir. 1977)
 
 
 [2]
 A more detailed description of the process appears in State v. Hibbs, 123 N.J.Super. 152, 301 A.2d 789 (Mercer County Ct.1972)
 
 
 [3]
 The New York Telephone opinion expressly refused to consider whether the fourth amendment requires a warrant for the installation of a pen register. 434 U.S. at 165 n. 7, 98 S.Ct. 364. It would seem to follow that a district court has authority to issue these warrants whether or not they are necessary. Cf. id. at 186, 98 S.Ct. at 379 (Stevens, J., dissenting) ("If, on the one hand, the individual's privacy interest is not constitutionally protected, judicial intervention is both unnecessary and unauthorized.") Thus we need not and do not decide whether the fourth amendment requires a warrant for traces. Cf. Smith v. Maryland, --- U.S. ----, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (No warrant is required for pen registers.)