STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MERRELL HUNT AND RALPH PIRILLO, SR., DEFENDANTS-APPELLANTS.

Argued May 4, 1982—Decided August 18, 1982.

339

*Edwin J. Jacobs, Jr.,* argued the cause for appellants (*Tort, Jacobs, Gross, Rosenberger & Todd* and *Goldenberg, Mackler & Feinberg,* attorneys; *John F. Collins* and *Harry A. Goldenberg,* of counsel; *John F. Collins* and *Alan M. Lands,* on the brief).

*Daniel Louis Grossman,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

SCHREIBER, J.

Merrell Hunt and Ralph Pirillo, Sr. were indicted for bookmaking, *N.J.S.A.* 2A:112–3, maintaining a place for gambling, *N.J.S.A.* 2A:112–3, conspiracy to commit bookmaking, *N.J.S.A.* 2A:98–1, and aiding and abetting bookmaking, *N.J.S.A.* 2A:85–14. After the defendants' motions to suppress evidence because of allegedly unlawful searches and seizures by the police were denied, the defendants pursuant to a plea bargain pled guilty to conspiracy and bookmaking. The remaining counts were dismissed. Hunt was sentenced to four months in the Atlantic County jail, placed on probation for three years, and fined $1,000. Pirillo was sentenced to 75 days in the Atlantic County jail, placed on probation for two years, and fined $500.

The defendants appealed to the Appellate Division, raising eight separate issues relating to their suppression motions. The convictions were summarily affirmed. We granted defendants' joint petition for certification, 89 *N.J.* 413 (1982), primarily to consider the constitutionality of the warrantless search and

seizure of defendants' telephone toll billing records. We have considered the other issues raised by the defendants and find no merit in them. Accordingly, our discussion will be primarily directed to the disclosure of the telephone records.

The late Judge George Schoch, then Assignment Judge of Mercer County, authorized the wiretapping of the telephone of Robert A. Notaro, who was engaged in an illegal sports bookmaking enterprise. At least three telephone conversations between Notaro and the defendant Hunt relating to betting were overheard. The State police, having been alerted by one of the conversations, also observed Notaro meet with Hunt and Pirillo in Atlantic City on December 1, 1977 to discuss some gambling business. At about the same time a reliable informant advised the State police that Pirillo was a bookmaker with whom he had previously placed wagers on sporting events.

On September 18, 1978, another reliable informant advised Detective M. Robert Warner of the State police that defendant Hunt was conducting a gambling business daily between 11:00 a. m. and 9:00 p. m. over two telephones with different numbers. One of these numbers had already been revealed during the 1977 investigation. The two telephone numbers were listed in defendant Hunt's name at 17 North Hartford Ave., Apt. 5, Atlantic City. Detective Warner next went to the offices of the New Jersey Bell Telephone Company and obtained Hunt's home toll billing records for both telephone numbers for the two month period between June 23 and August 23, 1978. These records indicated frequent calls to Sports Phone Service, which furnishes up-to-the-minute data on results of sporting events.

Detective Warner listened in on a telephone conversation on September 30, 1978 between the informant and Hunt. Hunt gave some odds on certain college football games and the informant placed two bets. The next day the detective listened to another conversation between the informant and Hunt, during which odds were quoted and the informant placed a bet. The informant advised Warner that Hunt was a middleman

working for someone else. On October 4, 1978, Detective Warner applied to the Superior Court for permission to install pen registers on the two telephones for 10 days. The pen register is a device that records the numbers dialed on a telephone. *See In re Wire Communication*, 76 *N.J.* 255, 264 n.2 (1978) (describing mechanics of a pen register). The intercept application was granted and the pen registers attached.

Between October 6 and October 11, 35 calls were made from Hunt's telephones to a telephone number listed in the name of defendant Pirillo at 2205 Revere Boulevard, Brigantine, N.J. Moreover, calls were made to certain Philadelphia telephone numbers of known gamblers.

Detective Warner next obtained a court order authorizing the wiretapping of Hunt's telephones. The monitoring occurred on a daily basis between October 14, 1978 and October 23, 1978. Based on information obtained during the wiretapping, which clearly established the bookmaking activity, Detective Warner obtained a warrant to search Hunt, his residence on North Hartford Avenue, and his car, and Pirillo, his home in Brigantine, and his car. The detective went to Hunt's home and found Hunt at the kitchen table surrounded with gambling paraphernalia. There was a bulletin board containing slips of paper with names and figures. More slips of paper were found in the bedroom along with $6,000. No evidence was uncovered during the other authorized searches.

The defendants moved to suppress the following evidence: (1) Hunt's toll billing records; (2) the data obtained from the pen registers; (3) the information obtained from the wire interceptions of the Hunt and Pirillo telephones between October 14 and October 23; and (4) the evidence uncovered during the search of the Hunt and Pirillo premises.

As indicated at the outset, our concern is with the toll billing records. The key questions are whether an individual has a protectible interest in those records under the Fourth Amendment to the federal Constitution or Article I, par. 7 of the New

Jersey Constitution. Both constitutional provisions acknowledge the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The historical roots of the Fourth Amendment centered about protection from unwarranted intrusions into the home. This privacy interest in the home and place of business has continued unabated throughout our judicial history. Indeed, as the telephone has taken its place in the home and at business, the privacy interest has expanded to include telephone conversations.

The United States Supreme Court has protected a telephone conversation from governmental eavesdropping by an electronic recording device. *Katz v. United States,* 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.*2d 576 (1967). That Court has also indicated that it will not protect information or material beyond the conversation itself. We surmise as much because of its decision in *Smith v. Maryland,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.*2d 220 (1979). In that case, without a warrant or court order, the police placed a pen register on the defendant's telephone. On the basis of information obtained from the pen register and other evidence, the police obtained a warrant to search the defendant's home. The defendant sought to suppress the evidence obtained. The Supreme Court rejected the motion.

Justice Blackmun, writing for the majority of five, stated that two discrete questions were involved. The first was whether the "individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy'...." *Id.* at 740, 99 *S.Ct.* at 2580, 61 *L.Ed.*2d at 226. He answered this in the negative, holding that people do not generally entertain any actual expectation of privacy in the numbers dialed because the telephone company must be made aware of the number in order to effectuate the call, bill the caller, and use the information for other legitimate reasons. The second question was whether, irrespective of the individual's expectation of privacy, society was prepared to recognize such an expectation as reasonable. *Id.* at 740, 99 *S.Ct.* at 2580, 61 *L.Ed.*2d at 227. Justice Blackmun also answered this

question in the negative because a person has no legitimate expectation of privacy in information voluntarily turned over to third parties. He analogized the telephone caller to a bank depositor who has no legitimate expectation of privacy in financial information transmitted to banks and exposed to their employees.[1]

The expectation of privacy in a pen register, both subjectively and objectively, is substantially similar to that in toll billing records. The difference between toll billing records, which reflect long distance completed calls, and the pen register, which identifies all local and long distance numbers dialed, whether completed or not, does not have any impact upon Justice Blackmun's analysis. His rationale places the toll billing record into the pen register mold. This conclusion is borne out by the federal courts that have passed on this question and have concluded that toll billing records are not entitled to Fourth Amendment protection. *Reporters Committee v. American Telephone & Telegraph Co.,* 593 *F.*2d 1030 (D.C.Cir.1978), *cert.* denied, 440 *U.S.* 949, 99 *S.Ct.* 1431, 59 *L.Ed.*2d 639 (1979); *United States v. Fithian,* 452 *F.*2d 505 (9th Cir. 1971); *DiPiazza v. United States,* 415 *F.*2d 99 (6th Cir. 1969).

Our inquiry does not end at this point, for we must consider the application of the search and seizure safeguard in the New Jersey Constitution. This Court has seen fit to hold that the search and seizure provisions in the federal and New Jersey Constitutions are not always coterminous, despite the congruity of the language. *State v. Alston,* 88 *N.J.* 211, 225–26 (1981); *State v. Johnson,* 68 *N.J.* 349, 353 (1975); *cf. State v. Schmid,* 84 *N.J.* 535, 557 (1980) (broader concepts of individual rights of speech under New Jersey Constitution). Though notions of

---

[1] *Smith v. Maryland* was preceded by *United States v. Miller,* 425 *U.S.* 435, 442, 96 *S.Ct.* 1619, 1623, 48 *L.Ed.*2d 71, 79 (1976), which held that a bank depositor has no "legitimate expectation of privacy" in financial information "voluntarily conveyed to ... banks and exposed to their employees in the ordinary course of business."

federalism may seem to justify this difference, enforcement of criminal laws in federal and state courts, sometimes involving the identical episodes, encourages application of uniform rules governing search and seizure. Divergent interpretations are unsatisfactory from the public perspective, particularly where the historical roots and purposes of the federal and state provisions are the same.

Sound policy reasons, however, may justify a departure. New Jersey has had an established policy of providing the utmost protection for telephonic communications. Long before the Supreme Court's opinion in *Katz v. United States, supra,* the New Jersey Legislature had in a 1930 statute made it a misdemeanor to tap a telephone line. *L.* 1930, *c.* 215, § 1, at 987. Justice Wachenfeld commented on this statute in *Morss v. Forbes,* 24 *N.J.* 341, 363 (1957): "The Legislature, as the foremost exponent of the public policy of this State, has condemned the tapping of wires as a method for achieving the detection and punishment of crime."

This proscription of the 1930 statute was continued until 1968, see *R.S.* 2:171–1 (1930) and *N.J.S.A.* 2A:146–1, when it was replaced by a substantially similar ban incorporated in the Wiretapping and Electronic Surveillance Control Act, *N.J.S.A.* 2A:156A–1 *et seq.* In addition to the legislative restrictions on wiretaps, our case law has adopted a policy of protecting the privacy of telephonic communications. In *In re Wire Communication,* we held that "[s]tatutes that directly impinge on the individual's right to be free from unwarranted governmental intrusion into privacy should be construed narrowly." 76 *N.J.* at 268. *See also State v. Catania,* 85 *N.J.* 418 (1981) (interpretation of wiretap minimization provision); *State v. Cerbo,* 78 *N.J.* 595 (1979) (State must seal tapes of completed wiretap immediately upon expiration of the tap).

In this case we are persuaded that the equities so strongly favor protection of a person's privacy interest that we should apply our own standard rather than defer to the federal provi-

sion. We do so in the spirit announced in a recent comment, "The Interpretation of State Constitutional Rights," 95 *Harv.L. Rev.* 1324, 1367 (1982):

> In our federal system, state constitutions have a significant role to play as protectors of individual rights and liberties. This role derives its character from the freedom of state courts to move beyond the protections provided by federal doctrine and from the distinctive character of state courts and state constitutions. But the state constitutional role is also shaped by the emergence of the federal Bill of Rights in recent decades as the primary constitutional shield against intrusions by all levels of government. The present function of state constitutions is as a second line of defense for those rights protected by the federal Constitution and as an independent source of supplemental rights unrecognized by federal law.

■ Technological developments have enlarged our conception of what constitutes the home. The telephone has become an essential instrument in carrying on our personal affairs. It has become part and parcel of the home. When a telephone call is made, it is as if two people are having a private conversation in the sanctity of their living room. It is generally understood to consist of a conversation between two persons, no third person being privy to it in the absence of consent. It is well settled that telephone conversations carried on by people in their homes or offices are fully protected from governmental intrusions. *Katz v. United States, supra.*

Not all telephone conversations enjoy the same privacy. If one party makes the conversation available to others, such as through the use of a speaker phone or by permitting someone else to hear, as was done on occasion in this case when the informant permitted the detective to listen to the conversation, the privacy interest does not remain the same. However, when neither party permits any interference with the call and only the telephone company in the course of its operations is privy to any information, the question remains whether the company's participation destroys the sanctity of the call, which comprises data as to both who was contacted and what message was conveyed, so as to permit unauthorized governmental intrusion.

The telephone caller is "entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world."

*Id.,* 389 *U.S.* at 352, 88 *S.Ct.* at 511, 19 *L.Ed.*2d at 582. Similarly, · he is entitled to assume that the numbers he dials in the privacy of his home will be recorded solely for the telephone company's business purposes. From the viewpoint of the customer, all the information which he furnishes with respect to a particular call is private. The numbers dialed are private. The call is made from a person's home or office, locations entitled to protection under the Fourth Amendment and Article I, par. 7 of the New Jersey Constitution. Justice Stewart in his dissent in *Smith v. Maryland, supra,* cogently observed:

> Most private telephone subscribers may have their own numbers listed in a publicly distributed directory, but I doubt there are any who would be happy to have broadcast to the world a list of the local or long distance numbers they have called. This is not because such a list might in some sense be incriminating, but because it easily could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life. [442 *U.S.* at 748, 99 *S.Ct.* at 2584, 61 *L.Ed.*2d at 231]

Allowing such seizures without warrants can pose significant dangers to political liberty. Chief Judge J. Skelly Wright, dissenting in *Reporters Committee v. American Telephone & Telegraph Co.,* 593 *F.*2d at 1079, detailed some *actual* abuses that have occurred. For example, in response to a Jack Anderson column embarrassing to former Vice President Agnew, the FBI secured Anderson's toll billing records. An Anderson source lost his job as a city attorney because his telephone number appeared on Anderson's billing record. See *id.* at 1090–91 & n.27.

It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons. The toll billing record is a part of the privacy package.

■ We realize that some state courts have followed the reasoning of *Smith,* holding there is no expectation of privacy in long distance call records of the telephone company. *In re Order for Indiana Bell Telephone to Disclose Records,* 409 *N.E.* 2d 1089 (Sup.Ct.Ind.1980); *State v. Fredette,* 411 *A.2d* 65 (Sup. Ct.Me.1979); *cf. Fitzgerald v. State,* 599 *P.2d* 572 (Sup.Ct.Wyo. 1979) (bank records). However, this view has been sharply criticized. *See* 1 *LaFave, Search and Seizure,* § 2.7, at 67–69 (Supp.1982) (contending that individuals have a legitimate expectation of privacy in telephone and bank records); Note, 15 *Harv.C.R.–C.L.L.Rev.* 753 (1980). We believe the better reasoned opinions accord with Professor LaFave's view. *See Charnes v. DiGiacomo,* 612 *P.2d* 1117 (Sup.Ct.Colo.1980) (departing from *United States v. Miller*); *People v. Blair,* 25 *Cal.*3d 640, 602 *P.2d* 738, 159 *Cal.Rptr.* 818 (1979) (departing from *Smith v. Maryland*); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 *A.2d* 1283 (1979), *cert. denied,* 444 *U.S.* 1032, 100 *S.Ct.* 704, 62 *L.Ed.2d* 668 (1980) (departing from *United States v. Miller*); *Burrows v. Superior Court of San Bernardino County,* 13 *Cal.*3d 238, 529 *P.2d* 590, 118 *Cal.Rptr.* 166 (1974) (legitimate expectation of privacy in bank records). As Justice Mosk observed in *Blair,* "a telephone subscriber has a reasonable expectation that the calls he makes will be utilized only for the accounting functions of the telephone company and that he cannot anticipate that his personal life, as disclosed by the calls he makes and receives, will be disclosed to outsiders without legal process." 25 *Cal.*3d at 653, 602 *P.2d* at 746, 159 *Cal.Rptr.* at 826 (adopting rationale of *People v. McKunes,* 51 *Cal.App.*3d 487, 124 *Cal.Rptr.* 126 (1975)). Thus we are satisfied that the police wrongfully obtained the toll billing records of the defendant Hunt in that they were procured without any judicial sanction or proceeding.

The decision we adopt herein should be applied only to all billing records processed after today. It will cause a sharp break in the practice of the police authorities, announces a new rule, and changes prior law. Moreover, we are satisfied that

retroactivity would have a considerable adverse impact on the administration of justice. The Attorney General has advised us that there have been a significant number of telephone toll record acquisitions in criminal investigations and that the investigative technique of obtaining telephone billing records, like pen registers, has been employed generally in the initial stages of investigations. There are hundreds of pending cases, with innumerable defendants, involving these records. Under these circumstances and since we are concerned with the exclusionary rule, retroactivity is not appropriate. *See State v. Burstein*, 85 *N.J.* 394 (1981).[2]

 The wrongfully acquired records do not justify suppression of the evidence procured pursuant to the search warrant. Defendants contend that all the evidence obtained after the police examined Hunt's toll billing records must be suppressed under the familiar doctrine that all the fruit of the poisonous tree must fall. *See Wong Sun v. United States*, 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.2d* 441 (1963); *Nardone v. United States*, 308 *U.S.* 338, 60 *S.Ct.* 266, 84 *L.Ed.* 307 (1939). All evidence subsequently obtained, however, is not automatically inadmissible. If the subsequently obtained evidence was acquired from an independent source unrelated to the illegal search, *Silverthorne Lumber Co. v. United States*, 251 *U.S.* 385, 392, 40 *S.Ct.* 182, 183, 64 *L.Ed.* 319, 321 (1920), or the causal connection between the illegal conduct and the discovery of the challenged evidence was "so attenuated" that the taint was dissipated, *Nardone v. United States*, 308 *U.S.* at 341, 60 *S.Ct.* at 267, 84 *L.Ed.* at 312, then such evidence is admissible.

Hunt's toll billing records revealed nothing more than that he had two telephone numbers—information the police already had—and that frequent telephone calls had been made to the Sports Phone Service. This latter fact had little, if any, bearing on the court orders providing for the wire intercepts or the

---

[2]We note in passing that the defendant has not argued or briefed this issue.

search warrants. The lawfully obtained information in the affidavits upon which the court orders and warrants were based justified their issuance. Thus the evidence taken was properly seized and is not subject to suppression. *Alderman v. United States,* 394 *U.S.* 165, 180–83, 89 *S.Ct.* 961, 970–72, 22 *L.Ed.2d* 176, 190–92 (1969); *State v. Ortense,* 174 *N.J.Super.* 453 (App. Div.1980).

For similar reasons, failure to suppress the toll billing records themselves was undoubtedly harmless error. The only information these records could have provided beyond evidence already admissible is the fact that Hunt frequently called Sports Phone. That fact is too insignificant to have had any bearing on a trial on these charges.

The judgments are affirmed.

PASHMAN, J., concurring.

I concur in all respects with the result reached by the Court in this case. I write for two specific reasons. First, I wish to underscore the importance of the privacy interests implicated here by pointing out the significant dangers to civil liberties that would be posed by unrestrained police access to personal telephone billing records. Second, and at least as important, I feel impelled to address the discussion in both the majority opinion and Justice Handler's concurrence concerning the extent to which this Court should construe the New Jersey Constitution to offer greater protection of the fundamental rights and liberties of New Jersey citizens than that offered under the federal constitution as interpreted by the United States Supreme Court. Because I believe that both opinions define too narrowly the circumstances under which New Jersey courts should independently construe the New Jersey Constitution, I offer my own analysis of the theoretical bases of state constitutional interpretation and its limitations.

## I

The majority aptly describes the privacy interests of New Jersey citizens in the phone numbers they dial. The majority also persuasively refutes the reasoning offered by the United States Supreme Court for denying the privacy interests in that information. *See Smith v. Maryland*, 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.*2d 220 (1979). What is missing from the majority opinion is a full appreciation of the danger of political abuse posed by unlimited police access to knowledge of whom private citizens are calling and therefore of the importance of the warrant requirement as a check on this potential for abuse. I do not mean to imply that New Jersey police have used or would use such information for other than legitimate law enforcement purposes. But the genius of our Bill of Rights is that our liberties are safeguarded not by governmental self-restraint, but by constitutional guarantee.

The case of *Reporters Committee for Freedom of the Press v. American Telephone and Telegraph Co.*, 593 *F.*2d 1030 (D.C.Cir. 1978), is particularly instructive. *See* Discussion of *Reporters Committee, ante* at 347. The majority there reached a result contrary to ours and, in response, Judge Skelly Wright filed a telling dissent detailing actual abuses of toll billing records by the federal government. For example, in 1971, FBI agents involved in the Daniel Ellsburg-Pentagon Papers case were given the billing records of Richard Dudman and Knight Newspapers, affiliates of which had published portions of the Pentagon Papers. *Reporters Committee*, 593 *F.*2d at 1080. That same summer, in an attempt to learn the source of an embarrassing article by Jack Anderson about Spiro Agnew, the FBI, at the behest of the White House, obtained the billing records of Anderson and three of his employees. *Id.* In one instance, a Jack Anderson source lost his job as a city attorney when his phone number appeared on Anderson's billing records. *Id.* at 1090–91, n.27. Finally, upon learning that David Rosenbaum of *The New York Times* had information about the suppression of an IRS investigation for political reasons, the IRS

sought billing records "not only for Mr. Rosenbaum's telephone, but for all the telephones of the entire staff of the Washington Bureau of *The New York Times* for a six-month period." *Id.* at 1080–81.

Judge Wright focused on the dangers that unrestrained government access to billing records can pose for freedom of the press. Such access can penalize sources for stories that embarrass or criticize government officials and deter other sources from coming forward. *Reporters Committee,* 593 *F.*2d at 1090–91. Our holding in this case thus adds an important bulwark to New Jersey's strong protection of the confidentiality of press sources. *See Maressa v. New Jersey Monthly,* 89 *N.J.* 176 (1982).

Other improper political uses of billing records are certainly imaginable. In *NAACP v. Alabama,* 357 *U.S.* 449, 78 *S.Ct.* 1163, 2 *L.Ed.*2d 1488 (1958), the Supreme Court held that the State of Alabama could not require the NAACP to turn over its membership lists because the publication of that list could subject the members to harassment, in effect penalizing them for a protected political association. Government access to the billing records of such protected political organizations would allow government to accomplish indirectly what the First Amendment prohibited it from doing directly.

Even aside from these potential political abuses, the names of whom one calls are, as Justice Schreiber points out, an extremely private matter that no citizen should be required to disclose without probable cause that a crime was or will be committed.

The requirement that police obtain a warrant before seizing toll billing records is at most a minimal burden that in no way intrudes upon legitimate police activity. There is no danger that billing records will be destroyed or secreted during the time needed to get a warrant. Yet this simple requirement can go a long way towards preventing abuses of the type detailed by Judge Wright in *Reporters Committee.*

## II

For quite a few years, this Court, and other state courts across the country, have been construing state constitutions to extend a greater measure of protection for fundamental constitutional rights than the United States Constitution has been construed to afford. See the cases collected in Justice Handler's concurrence, *ante* at 340–342. We have done so on the basis of provisions in our constitution not found in the federal constitution, *see, e.g., Robinson v. Cahill,* 62 *N.J.* 473 (1973), *cert.* den. *sub nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973) ("thorough and efficient" education clause), or on the basis of provisions virtually identical to federal provisions, *see, e.g., State v. Johnson,* 68 *N.J.* 349 (1975) (freedom from "unreasonable searches and seizures"). We have not hesitated to do this in the face of directly contrary United States Supreme Court decisions. In *Robinson v. Cahill,* we rejected the holding in *San Antonio School District v. Rodriguez,* 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.2d* 16 (1973), and here we essentially reject *Smith v. Maryland,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.2d* 220 (1979).

That this Court has the power to construe the New Jersey Constitution to reach results contrary to United States Supreme Court decisions construing the federal constitution is not controverted. Each state has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *PruneYard Shopping Center v. Robins,* 447 *U.S.* 74, 81, 100 *S.Ct.* 2035, 2040, 64 *L.Ed.* 2d 741 (1980). *See Oregon v. Hass,* 420 *U.S.* 714, 718, 95 *S.Ct.* 1215, 1218, 43 *L.Ed.2d* 570 (1975); *State v. Alston,* 88 *N.J.* 211 (1981); Brennan, "State Constitutions and the Protection of Individual Rights," 90 *Harv.L.Rev.* 489 (1977) ("State Constitutions"). Of course, the State constitution cannot contravene a federally guaranteed constitutional right any more than a state statute can. Thus, the United States Constitution as construed by the United States Supreme Court establishes the minimum degree of protection a state must give to constitutional rights. At the same time, state constitutions may provide further

protection for individual liberties by limiting state powers to a greater degree than they are limited by the federal constitution. In deciding the appropriate extent of this protection, this Court is the final arbiter of the meaning of the New Jersey Constitution.

This Court has not to date set forth any rules, principles or theories explaining when it will go beyond the federal courts in protecting constitutional rights and liberties. Our cases have merely stated our undoubted power to construe the New Jersey Constitution in accord with our own analysis of the particular right at issue. *See, e.g., State v. Alston,* 88 *N.J.* at 226 (standing to assert Fourth Amendment rights); *State v. Schmid,* 84 *N.J.* 535, 558–60 (1980) (First Amendment rights on a private university campus); *State v. Saunders,* 75 *N.J.* 200, 216–17 (1977); *State v. Johnson,* 68 *N.J.* at 353.

Consequently, I applaud Justice Handler's thoughtful effort to rationalize our cases in this area and to analyze when divergent state and federal constitutional interpretations are appropriate. However, I disagree with his analysis. In his view, this Court should adhere to the federal constitutional interpretation unless one of several factors is present showing that a different interpretation is of special concern to New Jersey. The factors listed include differences in the texts of the two constitutions, pre-existing state law and distinctive state traditions and public attitudes. Although the factors listed are potentially broad, they impose clear limits. At bottom, Justice Handler's approach effectively entails a presumption against divergent interpretations of our constitution unless special reasons are shown for New Jersey to take a path different from that chosen at the federal level.[1] Similarly, the majority here suggests that "[d]i-

---

[1] I recognize that Justice Handler does not believe that the effect of his analysis would be to create a presumption against independent state constitutional analysis, *ante* at 349, but his opinion can be read to provide precisely that. It appears that he would find divergence from the federal constitution improper unless one of the standards he sets forth is met. To the extent this

vergent interpretations are unsatisfactory," *ante* at 345, absent "[s]ound policy reasons." *Ante* at 345.

I would reverse the presumption. As a general rule, this Court should construe the New Jersey Constitution as it considers appropriate, taking into account the various factors that constitute sound constitutional analysis. United States Supreme Court opinions, both majority and dissenting opinions, can be valuable sources of wisdom for us. But this Court should not uncritically adopt federal constitutional interpretations for the New Jersey Constitution merely for the sake of consistency. Of course, there are certain situations and contexts that, for policy reasons, call for uniform national rules. In those circumstances, the need for uniformity should be weighed into the balance, with the possible result that we will conform to the federal rule when we would not otherwise have done so.

Stated succinctly, Justice Handler urges that we follow federal constitutional interpretation unless there are particular reasons to diverge from it. I believe there are several strong reasons why this Court should perform an independent constitutional analysis unless there are particular reasons to conform.

The simplest but perhaps most compelling reason for extending state constitutional rights beyond their federal counterparts is that it strengthens the constitutional safeguards of fundamental liberties. "[O]ne of the strengths of our federal system is that it provides a double source of protection for the rights of our citizens." Brennan, "State Constitutions," 90 *Harv.L.Rev.* at 503. When this Court considers that important constitutional rights are inadequately protected by the federal constitution, we have an obligation under the State Constitution to supply that protection. The virtue of independent sources of constitutional protection is that, as Justice Brennan stated, quoting James

---

is true, he is creating a presumption that can only be overcome by fitting the case within one of those standards.

Madison, "independent tribunals of justice 'will be naturally led to resist every encroachment upon rights ....'" 90 *Harv.L.Rev.* at 504. The New Jersey Constitution is a separate fount of liberty, and we must enforce it.[2]

A second reason for extending state constitutional interpretation beyond the limits imposed at the federal level derives from the resultant diversity of constitutional analysis. The majority and Justice Handler assume without explanation that uniformity in constitutional law is an unqualified advantage. However, as one commentator has stated, "Rather than threaten the federal system, such a process [of state constitutional law] is more likely to create a healthy debate over the interpretation of federal law." "Developments in the Law—The Interpretation of State Constitutional Rights," 95 *Harv.L.Rev.* 1324, 1396. Similar constitutional concepts can be developed in a variety of ways. The path chosen by the United States Supreme Court is not necessarily the best, the most protective of our constitutional rights, or the most reflective of the intent of the Framers. *See* Levenson, " 'The Constitution' in American Civil Religion," 1979 *The Supreme Court Review* 123, 140–41.[3] State supreme courts, if not discouraged from independent constitutional analysis, can serve, in Justice Brandeis' words, "as a laboratory" testing competing interpretations of constitutional concepts that may better serve the people of those states. *See New State Ice Co. v. Liebmann,* 285 *U.S.* 262, 310–11, 52 *S.Ct.* 371, 386, 76 *L.Ed.*

---

[2]We recognized this in *State v. Alston,* 88 *N.J.* at 226, in a forthright opinion by Justice Clifford:

Because we find that these recent decisions of the Supreme Court provide persons with inadequate protection against unreasonable searches and seizures, we respectfully part company with the Supreme Court's view of standing and construe Article I, paragraph 7 of our State Constitution to afford greater protection.

[3]As discussed below, the United States Supreme Court clearly perceives reasons for conservatism in enforcement of constitutional rights that do not apply to state courts.

747 (1931) (Brandeis, J., dissenting). In our federal system, there is strength in diversity and competition of ideas.[4]

A third important reason for extending our interpretation of constitutional rights beyond that offered by the United States Supreme Court is that we do not share the strong limitations perceived by that Court in its ability to enforce constitutional protections aggressively. Those limitations arise from the structure of our federal system, the Court's role as final arbiter of at least the minimum scope of constitutional rights for a vastly diverse nation, and the Court's lack of familiarity with local conditions. These difficulties do not similarly limit state courts.

In our federal system, many important governmental roles and decisions are reserved for the states. It is believed therefore that unduly "activist" enforcement of constitutional rights by the federal courts impinges on important state prerogatives. Justice Brennan, in his now famous article, explains that the Supreme Court has repeatedly allowed concerns of federalism to "limit the protective role of the federal judiciary." 90 *Harv.L. Rev.* at 503.

> Yet, the very premise of the cases that foreclose federal remedies constitutes a clear call to state courts to step into the breach. With the federal locus of our double protections weakened, our liberties cannot survive if the states betray the trust the Court has put in them. [Brennan, 90 *Harv.L.Rev.* at 503]

This Court has repeatedly recognized the significance of these federalism concerns and of the fact that they do not similarly limit this Court. Chief Justice Weintraub noted this in analyzing the state equal protection claim in *Robinson v. Cahill.*

> The question whether the equal protection demand of our State Constitution is offended remains for us to decide. Conceivably a State Constitution could be more demanding. For one thing, there is absent the principle of federalism which cautions against too expansive a view of a federal constitutional limitation upon the power and opportunity of the several States to cope with their own problems in the light of their own circumstances. The majority in *Rodriguez* expressly noted that "every claim arising under the Equal Protection Clause has

---

4As noted above, there are realms of constitutional law in which uniformity is an important interest and therefore must be considered. Absent such circumstances, however, we should not pursue uniformity for its own sake.

implications for the relationship between national and state power under our federal system," adding that "it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State" (93 *S.Ct.* at 1302) [62 *N.J.* 490–91] *See also State v. Schmid,* 84 *N.J.* at 559, 423 *A.2d* 615; *State v. Saunders,* 75 *N.J.* at 217. The presumption against state constitutional interpretation offered by my colleagues fails to recognize this important consideration.

The United States Supreme Court has also been hesitant to impose on a national level far-reaching constitutional rules binding on each and every state. This reluctance derives, first, from the nationwide jurisdiction of the Court. Once it settles a rule, experimentation with different approaches is precluded. *See San Antonio School District v. Rodriguez,* 411 *U.S.* at 43, 93 *S.Ct.* at 1302; 95 *Harv.L.Rev.* at 1348–51. Further, the Supreme Court has adverted to its lack of familiarity with local problems and conditions as a reason for hesitance. *San Antonio School District v. Rodriguez,* 411 *U.S.* at 41, 93 *S.Ct.* at 1301. Again, this applies with far less force at the state level.

For these various reasons, we should not be reluctant to engage in independent state constitutional analysis. None of our prior cases in this area has suggested hesitance, and there is no reason for it. Where this Court perceives that the federal constitution has been construed to protect the fundamental rights and liberties of our citizens inadequately, it cannot shrink from its duty to act. The New Jersey Constitution provides the citizens of this state with a fully independent source of protection of fundamental rights and liberties. It is our role alone to say what those rights are, and it is our solemn obligation to enforce them.

HANDLER, J., concurring.

I agree with the result reached by the majority in this case and its decision to utilize the State Constitution to vindicate a right seemingly neglected by the federal Constitution. I write

separately to expose the reasoning that I find implicit in our decision and to explain more fully the judicial principles which I believe underlie the salutary resort to state constitutions as a fountainhead of individual rights.

## I

The United States Supreme Court has clearly recognized that each state has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *PruneYard Shopping Center v. Robins,* 447 *U.S.* 74, 81, 100 *S.Ct.* 2035, 2040, 64 *L.Ed.2d* 741, 752 (1980). See *Oregon v. Hass,* 420 *U.S.* 714, 718, 95 *S.Ct.* 1215, 1218, 43 *L.Ed.2d* 570, 575 (1975); *Cooper v. California,* 386 *U.S.* 58, 62, 87 *S.Ct.* 788, 791, 17 *L.Ed.2d* 730, 734 (1967). With growing frequency, states are now availing themselves of this resource, finding in their own constitutions greater protections for citizens' rights than those found to exist under parallel provisions in the federal Constitution. See, *e.g., Shiras v. Britt,* 267 *Ark.* 97, 589 *S.W.2d* 18, 19 (1979); *People v. Rucker,* 26 *Cal.* 3d 368, 389–391, 605 *P.2d* 843, 856, 162 *Cal.Rptr.* 13, 26 (1980); *People v. Privitera,* 23 *Cal.3d* 697, 710, 591 *P.2d* 919, 926, 153 *Cal.Rptr.* 431, 438 (1979), *cert.* den., 444 *U.S.* 949, 100 *S.Ct.* 419, 62 *L.Ed.2d* 318 (1979); *State v. Kaluna,* 55 *Hawaii* 361, 369 n.6, 520 *P.2d* 51, 58 n.6 (1974); *O'Connor v. Johnson,* 287 *N.W.2d* 400, 405 (Minn.1979); *Keene Publishing Corp. v. Cheshire County Superior Court,* 119 *N.H.* 710, 406 *A.2d* 137, 138 (1979); *Cooper v. Morin,* 49 *N.Y.2d* 69, 79, 399 *N.E.2d* 1188, 1194, 424 *N.Y.S.2d* 168, 174 (1979), *cert.* den. 446 *U.S.* 984, 100 *S.Ct.* 2965, 64 *L.Ed.2d* 840 (1980); *Westchester Rockland Newspapers, Inc. v. Leggett,* 48 *N.Y.2d* 430, 436, 442, 399 *N.E.2d* 518, 521, 525, 423 *N.Y.S.2d* 630, 643–44 (1979); *Sharrock v. Dell Buick-Cadillac, Inc.,* 45 *N.Y.* 2d 152, 160–61, 379 *N.E.2d* 1169, 1173, 408 *N.Y.S.2d* 39, 43–44 (1978); *People v. Onofre,* 72 *A.D.2d* 268, 270, 424 *N.Y.S.2d* 566, 568 (1980). See generally Brennan, "State Constitutions and the Protection of Individual Rights," 90 *Harv.L.Rev.* 489, 491–95 (1977); Countryman, "The Role of a Bill of Rights in a Modern

State Constitution: Why a State Bill of Rights?," 45 *Wash.L. Rev.* 454, 456–59, 470–74 (1970); Falk, "Foreword The State Constitution: A More Than 'Adequate' Nonfederal Ground," 61 *Cal.L.Rev.* 273, 281–85 (1973); Force, "State 'Bill of Rights': A Case of Neglect and the Need for a Renaissance," 3 *Valparaiso L.Rev.* 125, 129, 142–43 (1969); Howard, "State Courts and Constitutional Rights in the Day of the Burger Court," 62 *Va.L.Rev.* 873, 874–77, 910–11 (1976); Howard, "The Supreme Court and Federalism," in *The Courts: The Pendulum of Federalism* 49, 71–76 (Roscoe Pound American Trial Lawyers Foundation 1979); Paulsen, "State Constitutions, State Courts and First Amendment Freedoms," 4 *Vand.L.Rev.* 620, 621 (1951); Project Report, "Toward an Activist Role for State Bills of Rights," 8 *Harv.C.R.–C.L.L.Rev.* 271, 285 (1973).

Our own courts have followed this same course, recognizing the New Jersey Constitution as an alternative and independent source of individual rights. We have expressed the firm belief that "state constitutions exist as a cognate source of individual freedoms and that state constitutional guarantees of these rights may indeed surpass the guarantees of the federal constitution." *State v. Schmid,* 84 *N.J.* 535, 553 (1980). We have, therefore, felt free to extend the guarantees of our State Constitution to a panoply of rights deemed essential to both the quality of individual life and the preservation of personal liberty. See, *Right to Choose v. Byrne,* 91 *N.J.* 287 (1982) (enhanced equal protection accorded individual right to health and privacy); *State v. Alston,* 88 *N.J.* 211, 227 (1981) (standing to challenge validity of car search); *Schmid,* 84 *N.J.* at 560 (right of free speech on private university campus); *State v. Ercolano,* 79 *N.J.* 25, 30, 34 (1979) (privacy-based freedom from "unreasonable searches and seizures"); *State v. Tropea,* 78 *N.J.* 309, 313 n.2 (1978) (double jeopardy and fundamental fairness); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 79 (1978) (equal protection); *State v. Saunders,* 75 *N.J.* 200, 216, 217 (1977) (right of sexual privacy); *Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp.,* 80 *N.J.* 6 (1976) (equal protection); *In re Quinlan,* 70

*N.J.* 10, 19, 40–41, 51 (1976), *cert.* den. *sub nom., Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976) (right of choice to terminate life support systems as aspect of right of privacy); *State v. Johnson,* 68 *N.J.* 349, 353 (1975) (freedom from "unreasonable searches and seizures"); *So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel,* 67 *N.J.* 151, 175, *cert.* den. and appeal dismissed, 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975) (zoning obligation of municipalities to provide housing opportunities for lower income groups); *State v. Gregory,* 66 *N.J.* 510, 513–14 (1975) (double jeopardy and fundamental fairness); *Robinson v. Cahill,* 62 *N.J.* 473, 482, 509 (1973), *cert.* den. *sub nom., Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973) (equal protection accorded right to an education); *Worden v. Mercer County Bd. of Elections,* 61 *N.J.* 325, 345–346 (1972) (right to vote). Justice Pashman emphasizes this point in his concurring opinion, *ante* at 350.

This Court has been fully responsive to its judicial role in ultimately resolving questions that concern its citizens. As Justice Brennan has observed: "[I]t is the state courts at all levels, not the federal courts, that finally determine the overwhelming number of the vital issues of life, liberty and property that trouble countless human beings of this Nation every year." Brennan, "Introduction: Chief Justice Hughes and Justice Mountain," 10 *Seton Hall L.Rev.* xii (1979). There is a danger, however, in state courts turning uncritically to their state constitutions for convenient solutions to problems not readily or obviously found elsewhere. The erosion or dilution of constitutional doctrine may be the eventual result of such an expedient approach.[1] See Collins, "Reliance on State Constitutions—Away

---

[1]This, in a sense, has occurred in California, labeled "the birthplace of th[e] new judicial independence" by one commentator. Note, "State Constitutional Guarantees as Adequate State Ground: Supreme Court Review and Problems of Federalism," 13 *Am.Crim.L.Rev.* 737, 740 (1976). The voters of that state recently passed a referendum requiring state courts to give the same meaning to provisions of the California Constitution as is given to parallel provisions in the U.S. Constitution. See Proposition 8 (adopted June 8, 1982). The refer-

From a Reactionary Approach," 9 *Hastings Const.L.Q.* 1, 2 (1981); Bice, "*Anderson* and the Adequate State Ground," 45 *S.Cal.L.Rev.* 750, 766 (1972). See generally "Developments—the Interpretation of State Constitutional Rights," 95 *Harv.L.Rev.* 1323, 1362–66 (1982).

It would be unfortunate if our decision today were cast in that light. The majority recognizes that, as a matter of federal constitutional law, personal telephone records are not constitutionally protected. *Ante* at 344–345. It then invokes the State charter to achieve a result unattainable under federal law.

There is surely no impropriety in state courts building an independent body of state constitutional law. See Wechsler, "Toward Neutral Principles of Constitutional Law," 73 *Harv.L. Rev.* 1 (1959). Moreover, there is no mandate that a state court explain itself when it invokes the state charter to achieve a result unavailable under federal law. See, *e.g.,* Collins, *supra,* 9 *Hastings Const.L.Q.* at 16–18; Kamp, "Private Abridgement of Speech and State Constitutions," 90 *Yale L.J.* 165 (1980); Kelman, "Forward: Rediscovering the State Constitutional Bill of Rights," 27 *Wayne L.Rev.* 413 (1981); Wilkes, "The New Federalism in Criminal Procedure: State Court Evasion of the Burger Court," 62 *Ky.L.J.* 421 (1974). Indeed, the trend of state courts using their own constitutions to avoid restrictive federal rules on individual rights can be regarded as a sign of healthy federalism for which no justification is required, since federal and state systems are in many respects separate sovereigns, each free to act without regard to the wishes of the other. Note, *supra,* 13 *Am.Crim.L.Rev.* at 748.

Nevertheless, our national judicial history and traditions closely wed federal and state constitutional doctrine. It is not entirely realistic, sound or historically accurate to regard the separation between the federal and state systems as a schism.

---

endum may affect the ability of the California courts to give their own charter independent force.

The states are not always free to act independently under their own constitutions. State constitutions may be used to supplement or expand federally guaranteed constitutional rights. However, they may never be used to undermine or circumscribe them. *U.S.Const.*, Art. VI, cl. 2. See *State v. Funicello*, 60 *N.J.* 60, 69 (1972) (Weintraub, C.J., concurring). Furthermore, a considerable measure of cooperation must exist in a truly effective federalist system. Both federal and state courts share the goal of working for the good of the people to ensure order and freedom under what is publicly perceived as a single system of law. See Hart, "Relations Between State and Federal Law," 54 *Colum.L.Rev.* 489 (1954); Note, *supra*, 13 *Am.Crim.L.Rev.* at 748–49. Moreover, while a natural monolithic legal system is not contemplated, some consistency and uniformity between the state and federal governments in certain areas of judicial administration is desirable.

For these reasons, state courts should be sensitive to developments in federal law. Federal precedent in areas addressed by similar provisions in our state constitutions can be meaningful and instructive. We have recently recognized the importance of federal sources of constitutional doctrine. See *General Assembly v. Byrne*, 90 *N.J.* 376, 381–384 (1982). The opinions of the Supreme Court, while not controlling on state courts construing their own constitutions, are nevertheless important guides on the subjects which they squarely address.

It is therefore appropriate, in my estimation, to identify and explain standards or criteria for determining when to invoke our State Constitution as an independent source for protecting individual rights. See *State v. Simpson*, 95 *Wash.*2d 170, 200–02, 622 *P.*2d 1199, 1217 (1980) (Horowitz, J., dissenting). See also Bice, *supra*, 45 *S.Cal.L.Rev.* at 765–68; Deukmejian & Thompson, "All Sail and No Anchor—Judicial Review Under the California Constitution," 6 *Hastings Const.L.Q.* 975, 987–96 (1979); Howard, *supra*, 62 *Val.L.Rev.* at 934–44. There are several considerations that are relevant and important in making that determination.

(1) Textual Language—A state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law. Textual language can be relevant in either of two contexts. First, distinctive provisions of our State charter may recognize rights not identified in the federal Constitution. For example, the New Jersey Constitution provides for a right to education (*N.J.Const.*, Art. VIII, § 4, par. 1) which has served as the basis for protections not afforded by the federal Constitution. *Robinson,* 62 *N.J.* 473.

Second, the phrasing of a particular provision in our charter may be so significantly different from the language used to address the same subject in the federal Constitution that we can feel free to interpret our provision on an independent basis. Thus, in *Schmid,* we noted that the unique language of the New Jersey charter's free speech clause (*N.J.Const.*, Art. 1, par. 6) was one indication that the provision was meant to be broader in scope than the First Amendment. 84 *N.J.* at 557. See *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 207–08 (1982) (Schreiber, J., dissenting). See also *State v. Sklar,* 317 *A.*2d 160, 169 (Me.1974) (broadened right to jury trial suggested by difference between *Me.Const.* art. I, § 6, guaranteeing jury trial in "all criminal prosecutions," and federal language limiting right to jury trial to "Crimes," *U.S.Const.* art. III, § 2, cl. 3); *Alderwood Assocs. v. Washington Envtl. Council,* 96 *Wash.*2d 230, 240–43, 635 *P.*2d 108, 114–16 (1981) (en banc) (plurality opinion) (*Wash.Const.* art. I, § 5 mandates broader protections of speech than *U.S.Const.* amend. I, because the former is not confined to cases involving state action). Moreover, the fundamental right to choose to have an abortion is entitled to enhanced protection under our State Constitution's doctrine of equal protection, found to be implicit in *N.J.Const.*, Art. 1, par. 1. *Right to Choose,* 91 *N.J.* at 302–304. And individual rights involving personal privacy may be recognized under the State Constitution's bill of rights. See *In re Grady,* 85 *N.J.* 235, 250 (1981) (recognizing the right of all people to enjoy and pursue their individual well-being and happiness).

(2) Legislative History—Whether or not the textual language of a given provision is different from that found in the federal Constitution, legislative history may reveal an intention that will support reading the provision independently of federal law. For example, in *Schmid,* we explored the legislative history in determining that our free speech clause was intended to be more expansive than the First Amendment. 84 *N.J.* at 557. See *Maressa,* 89 *N.J.* at 207–08 (Schreiber, J., dissenting). See also *State v. Miyaski,* 62 *Hawaii* 269, 281–82, 614 *P.*2d 915, 922–23 (1980) (*Hawaii Const.,* art. I, § 10 meant to incorporate the self-incrimination protections provided by *U.S.Const.* amend. V as interpreted at time state constitution was adopted, but not to incorporate subsequent erosion of the federal standard).

(3) Preexisting State Law—Previously established bodies of state law may also suggest distinctive state constitutional rights. See *Schmid,* 84 *N.J.* at 557. State law is often responsive to concerns long before they are addressed by constitutional claims. Howard, *supra,* 62 *Val.L.Rev.* at 1416–18. Such preexisting law can help to define the scope of the constitutional right later established. *Id.*

(4) Structural Differences—Differences in structure between the federal and state constitutions might also provide a basis for rejecting the constraints of federal doctrine at the state level. The United States Constitution is a grant of enumerated powers to the federal government. *Saunders,* 75 *N.J.* 200, 225–26 (1977) (Schreiber, J., concurring); *Gangemi v. Berry,* 25 *N.J.* 1, 8–9 (1957). Our State Constitution, on the other hand, serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives.[2] *Schmid,* 84 *N.J.* at 558; *Smith v. Penta,* 81 *N.J.* 65, 74 (1980); *Gangemi,* 25 *N.J.*

---

[2]For example, the First Amendment simply provides that "Congress shall make no law ... abridging the freedom of speech," *U.S.Const.* amend. I, while the New Jersey Constitution affirmatively guarantees that "[e]very person may freely speak, write and publish his sentiments on all subjects," *N.J.Const.* (1947), Art. 1, par. 6.

at 8–9. Hence, the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them. *Schmid*, 84 *N.J.* at 558. See also *Alderwood*, 96 *Wash.*2d at 238–39, 242, 635 *P.*2d at 113, 115 (state action requirement is dictated by conservative pressures peculiar to federal constitutional role and, thus, is not applicable at the state level).

(5) Matters of Particular State Interest or Local Concern—A state constitution may also be employed to address matters of peculiar state interest or local concern. When particular questions are local in character and do not appear to require a uniform national policy, they are ripe for decision under state law. See, *e.g.*, *National League of Cities v. Usery*, 426 *U.S.* 833, 96 *S.Ct.* 2465, 49 *L.Ed.*2d 245 (1976) (decision of what salary level to pay state employees properly reposes in states); *Cooley v. Board of Wardens of the Port of Philadelphia*, 53 *U.S.* (12 How.) 299, 13 *L.Ed.* 996 (1851) (pilotage is not of such a nature as to require uniform rule throughout country). Moreover, some matters are uniquely appropriate for independent state action. For example, in *Alston*, we adopted a rule of standing to challenge searches and seizures that is broader than the federal standard. 88 *N.J.* at 227. We felt free to do so because that question implicated the management of our own court system, which is of peculiarly local concern. It also reflected a strong state policy in favor of access to our courts and liberalized standing to vindicate legal claims. See, *e.g.*, *Salorio v. Glaser*, 82 *N.J.* 482, 490–91 (1980); *N.J. Chamber of Commerce v. N.J. Elec. Law Enforce. Comm.*, 82 *N.J.* 57, 67 (1980); *Home Builders League of South Jersey, Inc. v. Tp. of Berlin*, 81 *N.J.* 127, 132 (1979); *Crescent Park Tenants Ass'n v. Realty Equities Corp.*, 58 *N.J.* 98, 107 (1971).

(6) State Traditions—A state's history and traditions may also provide a basis for the independent application of its constitution. Thus, in *Schmid*, we emphasized New Jersey's strong tradition of protecting individual expressional and associational rights in holding that the New Jersey Constitution provided

greater protections for the right to free speech than those found in the federal Constitution. And in *State v. Bellucci,* 81 *N.J.* 531 (1979), we gave the state constitutional right to effective assistance of counsel more expansive protection than that found in the federal Constitution because of our firm policy regarding the proper role of attorneys in criminal trials. See also *Baker v. City of Fairbanks,* 471 *P.*2d 386, 399–401 (Alaska 1970) (broad availability of jury trial for petty offenses when constitution was adopted); *In re Advisory Opinion to the Senate,* 108 *R.I.* 628, 630, 278 *A.*2d 852, 853 (1971) (State's tradition of requiring twelve-person juries in criminal cases read into *R.I.Const.,* art. 1, §§ 10, 15).

(7) Public Attitudes—Distinctive attitudes of a state's citizenry may also furnish grounds to expand constitutional rights under state charters. While we have never cited this criterion in our decisions, courts in other jurisdictions have pointed to public attitudes as a relevant factor in their deliberations. See, *e.g., Ravin v. State,* 537 *P.*2d 494, 503–04 (Alaska 1975) (broad privacy protection mandated by Alaskans' desire for individualistic lifestyles); *District Attorney v. Watson,* 381 *Mass.* 648, ——, 1980 *Mass.Adv.Sh.* 2231, 2245, 411 *N.E.*2d 1274, 1282 (death penalty contrary to prevailing standards of decency in Massachusetts, as evidenced by absence of any use of death penalty in Commonwealth since 1948).

The explication of standards such as these demonstrates that the discovery of unique individual rights in a state constitution does not spring from pure intuition but, rather, from a process that is reasonable and reasoned. This process does not require presumptive weight to be accorded the federal experience, just an intelligent awareness and assessment of that experience.[3]

---

[3]To the extent that Justice Pashman suggests in his concurring opinion that this approach establishes a presumption in favor of federal constitutional interpretations, *supra* at 355, no decision of this Court has recognized such a presumption, and nothing in this opinion or in the majority opinion, as I read it, calls for or encourages the establishment of such a presumption.

See, *e.g., General Assembly,* 90 *N.J.* at 381–384. The enumerated criteria, which are synthesized from a burgeoning body of authority, are essentially illustrative, rather than exhaustive. They share a common thread—that distinctive and identifiable attributes of a state government, its laws and its people justify recourse to the state constitution as an independent source for recognizing and protecting individual rights.

## II

Applying these principles to this case, I am satisfied that adequate grounds exist for invoking the State Constitution. New Jersey's long history of statutory and legal protection for telephonic communications makes independent resort to the State charter appropriate in the face of conflicting federal law.

The majority correctly recognizes that toll billing records are not entitled to protection under the federal Constitution. *Ante* at 342–343. The Fourth Amendment protects the privacy of telephonic communications. See *Katz v. United States,* 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.2d* 576 (1967). However, it does not protect "[w]hat a person knowingly exposes to the public." *Id.* at 351, 88 *S.Ct.* at 511, 19 *L.Ed.2d* at 582. Hence, in *Smith v. Maryland,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.2d* 220 (1979), the Supreme Court held that a pen register may be used to record the numbers dialed from one's home phone without violating that individual's Fourth Amendment rights.[4] I agree with the majority that the rationale of *Smith* would appear just as applicable to the telephone company's release of billing records.[5]

---

[4] A pen register is "a mechanical device attached to a given telephone line and usually installed at a central telephone facility. It records on a paper tape all numbers dialed from that line." *United States v. Giordano,* 416 *U.S.* 505, 549 n.1, 94 *S.Ct.* 1820, 1842 n.1, 40 *L.Ed.2d* 341, 372 n.1 (1974) (Powell, J., concurring in part and dissenting in part).

[5] If anything, the pen register situation presents a stronger case for recognizing a constitutionally protectable privacy interest than does the billing records example. While a phone billing record notes only toll calls, a pen

In fact, every federal court that has addressed the issue has held that phone billing records are not protected by the Fourth Amendment. See, e.g., *Reporters Com. v. American Telephone & Telegraph*, 593 *F.*2d 1030, 1046 (D.C.Cir.1978), *cert.* den., 440 *U.S.* 949, 99 *S.Ct.* 1431, 59 *L.Ed.*2d 639 (1979); *United States v. Lustig*, 555 *F.*2d 737, 747 n.10 (9 Cir. 1977), *cert.* den., 434 *U.S.* 1045, 98 *S.Ct.* 889, 54 *L.Ed.*2d 796 (1978); *Nolan v. United States*, 423 *F.*2d 1031, 1044 (10 Cir. 1969), *cert.* den., 400 *U.S.* 848, 91 *S.Ct.* 47, 27 *L.Ed.*2d 85 (1970); *United States v. Covello*, 410 *F.*2d 536, 542 (2 Cir.), *cert.* den., 396 *U.S.* 879, 90 *S.Ct.* 150, 24 *L.Ed.*2d 136 (1969).

The question then becomes whether there exists a right cognizable under our State Constitution to protect the privacy of telephone billing records. As I have already explained, I would invoke the State charter as an independent source for protecting individual rights when there are sound reasons grounded in State law, tradition or policy to do so. I find such reasons present in this case.

Defendant Hunt claims that the release of his home telephone billing records violated Article 1, par. 7 of the New Jersey Constitution. That provision mirrors the language of the Fourth Amendment. However, identical language does not necessarily imply identical meaning. As Justice Holmes once stated: "A word is not a crystal, transparent and unchanged; it is the skin of a living thought." *Towne v. Eisner*, 245 *U.S.* 418, 425, 38 *S.Ct.* 158, 159, 62 *L.Ed.*2d 372, 376 (1918). Thus, we have held that "[e]ven if the language of the state constitutional and federal constitutional provisions were identical, this Court could

---

register records all numbers dialed, including local calls. Thus, the pen register provides more information than a toll billing record, making it arguably more intrusive of privacy. Moreover, the telephone company has a proper business reason for keeping toll billing records. However, it is under no compulsion to install pen register and would not have done so in *Smith* had the police not requested it.

give differing interpretations to the provisions." [6] *Schmid,* 84 *N.J.* at 557 n.8. *Accord, Johnson,* 68 *N.J.* at 353 n.2.

While I agree with the majority that, as a general rule, federal and state courts should apply uniform rules governing search and seizure, *ante* at 344, the "search and seizure" provisions of the federal and state constitutions have not always been found to be coterminous. See *Johnson,* 68 *N.J.* at 353.

In this instance, our concern is with the privacy of one's telephone billing record, which is an inescapable incident of telephone use. A survey of New Jersey law reveals an historial pattern of providing the utmost protection for telephonic communications. As noted by the majority opinion, *ante* at 345–346, the New Jersey Legislature saw fit to condemn the tapping of telephone lines long before the Supreme Court handed down its landmark decision in *Katz* and Congress responded by passing Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 *U.S.C.A.* §§ 2510–2520. See *L.* 1930, *c.* 215, § 1 at 987 (making it a misdemeanor to tap or make any connection with a telephone line or to aid any person to cause that to be done). This reflected an early and consistent public policy against this kind of invasion of privacy. *Morss v. Forbes,* 24 *N.J.* 341, 358–59 (1957). Our current statute, the New Jersey Wiretapping and Electronic Surveillance Control Act, *N.J.S.A.* 2A:156A–1 *et seq,* which generally parallels the present federal act, 18 *U.S.C.A.* §§ 2510–2520, has been construed as containing greater protections and stricter requirements than the federal statute. See, *e.g., State v. Catania,* 85 *N.J.* 418, 437 (1981) (State statutory wiretap minimization provision is more stringent than its federal counterpart); *State v. Cerbo,* 78 *N.J.* 595,

---

[6]As Justice Mosk of the California Supreme Court has observed: "It is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse." *People v. Brisendine,* 13 *Cal.*3d 528, 550, 531 *P.*2d 1099, 1113, 119 *Cal.Rptr.* 315, 329 (1975).

601 (1979) (State must seal tapes of completed wiretap immediately upon expiration of the tap); *In re Wiretap Communication,* 76 *N.J.* 255, 260 (1978) (wiretap statutes, implicating individual rights of privacy, are to be strictly construed to limit potential invasion); *State v. Molinaro,* 117 *N.J.Super.* 276 (Law Div.1971), rev'd, 122 *N.J.Super.* 181 (App.Div.1973) (intrinsic as well as extrinsic minimization required; legislative mandate of suppression must be enforced), cited with approval in *Catania,* 85 *N.J.* at 445; *State v. Sidoti,* 116 *N.J.Super.* 70 (Law Div.1971), rev'd on other grounds, 120 *N.J.Super.* 208 (App.Div.1972) (special need required to warrant wiretap of public telephone); *State v. Christy,* 112 *N.J.Super.* 48 (Law Div.1970) (requirements for wiretap order must be scrupulously met). But see *State v. Dye,* 60 *N.J.* 518 (1972), overruled by *Catania,* 85 *N.J.* at 431. Thus, through our statutory and case law, it has been the firm policy in this State to protect the privacy of telephonic communications to the fullest extent possible.

Of course, what is involved in this case is not the conversation itself but the record that a call was made. In a strict sense, the divulgence of the number dialed to make a call reveals nothing about the content of the conversation that transpired as a result of that call. Nevertheless, such information reveals a great deal about one's associational contacts and, inferentially, about the nature of one's communications. See *Smith,* 442 *U.S.* at 748, 99 *S.Ct.* at 2584, 61 *L.Ed.*2d at 231 (Stewart, J., dissenting). For this identical reason, I wrote separately in the *Wire Communication* case to express my view that the telephone company could be compelled under the Wiretap Act to conduct an in-progress trace in conjunction with a valid wiretap, subject to continuous judicial supervision and all of the strict procedural protections provided by that Act.[7] As I noted in that case, in the area of

---

[7]The mechanics of an in-progress trace are fully described in *State v. Hibbs,* 123 *N.J.Super.* 152, 154–59 (Cty.Ct.1972), aff'd, 123 *N.J.Super.* 124 (App.Div. 1973). To perform the trace, the telephone company connects a "trouble recorder" on the lines of the tapped phone. Like a pen register, the recorder

telephonic communications, the number dialed and the conversation that follows are "inextricably related." 76 *N.J.* at 271.

This interrelationship is evident from the very facts of this case. The phone billing records were sought as a preliminary step to obtaining a wiretap order. The police sought the information contained in those records to establish probable cause for a wiretap. The records revealed more than just numbers. They revealed enough about the nature of defendant's interactions and associations with other persons to justify allowing police to intrude on private communications. Since the content of telephone conversations themselves are unquestionably protected under our State charter, so logically should the record that conversations occurred. Thus, I agree with the majority that "all the information which [an individual] furnishes with respect to a particular call is private." *Ante* at 347. I would also urge that the use of such records be regulated strictly in accordance with the standards of the New Jersey Wiretapping and Electronic Surveillance Control Act. See *Wire Communications,* 76 *N.J.* at 283 (Handler, J., dissenting).

The protection we now accord telephone billing records follows the course long set under New Jersey law. As previously noted, our State has been a strong proponent in the area of protecting telephonic communications. We have safeguarded the privacy of such communications to the broadest extent possible. Consistent with this longstanding statutory and legal tradition of extending the utmost solicitude to telephonic communications, I am satisfied that the New Jersey Constitution protects the privacy of all aspects of telephone use, including toll billing records. Therefore, I concur in the opinion of the Court.

PASHMAN and HANDLER, JJ., concurring in the result.

---

then prints out a record identifying the phone number of all incoming calls. *Id.* at 156. The recorder neither monitors the call in any way nor interferes with the sending or receiving of calls. *Id.* at 157.

*For affirmance*—Chief Justice WILENTZ and Justices PASH-MAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.