The FIRST ATLANTIC LEASING CORP., et al, Plaintiff,

v.

Thomas M. TRACEY, Defendant/Third Party Plaintiff,

v.

FIRST ATLANTIC SAVINGS AND LOAN ASSOCIATION, Third Party Defendant.

Civ. A. No. 89–1009.

United States District Court, D. New Jersey.

Sept. 21, 1989.

Paul E. Stevenson, Apruzzese, McDermott, Mastro & Murphy, Springfield, N.J., for third-party defendant, First Atlantic Sav. and Loan Ass'n.

Edward A. Bertele, Levy, Lybeck, Schwartz, & Romankow, Union, N.J., for defendant third-party plaintiff, Thomas M. Tracey.

## OPINION

STANLEY R. CHESLER, United States Magistrate.

## INTRODUCTION

This matter comes before the Court on the application of third party defendant, First Atlantic Savings And Loan (First Atlantic), to compel discovery and to vacate a protective order issued by the Superior Court of the State of New Jersey, prior to the removal of the action to this court. Also before the Court is the cross motion of third party plaintiff, Thomas M. Tracey, for a protective order barring First Atlantic from requiring him to produce income tax returns, and records relating to various business entities. This motion was referred to me by the Honorable Harold A. Ackerman, United States District Judge. Oral argument was heard on July 10, 1989.

## BACKGROUND

In November 1987, the Federal Home Loan Bank Board (FHLBB) notified First Atlantic's board of directors that it was investigating one of the bank's officers, Thomas Tracey for engaging in improper transactions involving the bank. Thereafter, First Atlantic's audit committee conducted its own inquiry into the matter, and as a result, terminated Tracey's employment. Following the termination of Tracey's employment, the First Atlantic Leasing Corporation (Leasing) started suit in the New Jersey State courts to repossess an automobile which Tracey had used during his employment. Tracey in turn filed a third party complaint against First Atlantic for breach of contract and wrongful termination. First Atlantic counterclaimed against Tracey alleging that he had breached his fiduciary obligations to the bank in the course of various real estate transactions.

On September 1, 1988, First Atlantic served a request for production of documents upon Tracey. The request sought, *inter alia*, Tracey's tax returns for the years between 1984 through 1987. Tracey refused to turn over the tax returns, whereupon First Atlantic filed a motion to compel discovery. Tracey cross moved for a protective order barring First Atlantic from using any information in its possession concerning Tracey's personal bank accounts maintained at First Atlantic, during the course of the litigation. Tracey contended that his right to privacy, assertedly recognized by the New Jersey courts, barred the bank from reviewing his accounts at First Atlantic without using judicial process.

On November 28, 1988, the Superior Court entered an order requiring an *in camera* inspection of the tax returns sought by the bank. It also barred First Atlantic from using Tracey's bank account records in connection with the litigation. Specifically, the order provided that:

"First Atlantic Savings & Loan Association shall immediately cease and desist from examining any and all bank statements, account records of transactions in and out of the accounts in the name of Thomas Tracey, either individually or with any other person which it may have in its possession pursuant to this litiga-

tion and is barred from utilizing any information which it has obtained pursuant to an examination of said records in any manner in this litigation."

Thus the order not only barred any future review of this material, but prohibited the use of any information obtained through prior reviews.

The sole basis for the entry of this order was articulated by the court as follows:

[T]he bank has no business, because they are a litigant in this lawsuit, to examine the records of the defendant or the plaintiff or counterclaimant without the usual discovery techniques. They are in an unique position and they are still a bank, and still shouldn't be poking around the records without advising them that's what they are looking for and telling them that's what they are going to find.

So, I will allow such an order ...

[Tr. 11/18/88, p. 17].[1]

On December 2, 1988, the state court reviewed Mr. Tracey's income tax returns *in camera* and, after concluding that they were relevant to the case[2], directed that "Miscellaneous Income Statement Four" from Tracey's 1984 through 1987 income tax returns be provided to First Atlantic.

On January 6, 1989, counsel for Mr. Tracey was directed to provide the income tax material to the bank by Tuesday of the following week. On March 7, 1989, the court heard further argument concerning production of the tax returns—which had not been yet turned over. Tracey contended that the information which led the bank to conclude that the tax returns were relevant had been obtained through its prohibited review of Tracey's account records at First Atlantic. Tracey argued that the tax returns were therefore "fruits of the poisonous tree" and should be suppressed. [Tr. 3/7/89, p. 20]. The Court denied this request. At the same hearing, First Atlantic sought to reargue the court's order bar-

ring it from reviewing Tracey's personal banking records in its possession. The application was orally denied without any further explanation by the court. On March 13, 1989, the case was removed to this court. Tracey subsequently filed a motion to remand which was argued before and denied by Judge Ackerman. On March 17, 1989, First Atlantic propounded a Request for Production of Documents and Interrogatories on Tracey's attorney. The requests sought, *inter alia*, 1) Tracey's income tax returns and bank statements from 1982 through 1988, 2) all correspondence between Tracey and various title, property and mortgage companies, and 3) business tax returns of certain consulting and title firms from 1982 through 1988. Tracey's attorney requested extra time to comply with the discovery request, which First Atlantic's counsel refused. First Atlantic has now moved to compel discovery of this information and to vacate the Superior Court's protective order prohibiting it from utilizing its own records in this litigation.

## DISCUSSION

### I. The State Court Protective Order

As an initial matter, this court must determine whether it may properly reconsider the Superior Court's protective order, and assuming that it can, whether New Jersey or Federal law applies. It is Tracey's contention that the protective order was based upon New Jersey substantive law which, he insists, recognizes a right of financial privacy. Accordingly he contends that "this court cannot sit as an appellate tribunal nor may it substitute other principles for those upon which the decision has already been rendered." (Defendant Third Party Plaintiff's brief in opposition at p. 4).

Tracey further argues that since the decision was based upon state substantive law, it is the law of the case and must be followed by this court under *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.

---

1. All transcript citations refer to proceedings before the Superior Court of the State of New Jersey, Union County.

2. The court had, in its possession while reviewing the tax returns, a list of certain customers of

First Atlantic, provided by the bank. Apparently, the *in camera* review disclosed that Tracey had received reportable income from certain of these customers while he was a bank officer.

1188 (1938). I find these arguments unpersuasive.

■ Title 28 *U.S.C.* Section 1450 provides, in pertinent part, that "[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect *until dissolved or modified by the district court.*" (emphasis added). As implied by the statutory language of Section 1450, the District Court has the authority to dissolve or modify injunctions, orders and all other proceedings occurring in state court prior to removal. *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 437, 94 S.Ct. 1113, 1123, 39 L.Ed.2d 435 (1974). In *Ex Parte Fisk,* 113 U.S. 713, 5 S.Ct. 724, 28 L.Ed. 1117 (1885), the Court was confronted with a virtually identical issue. In that case, the respondent argued that an order issued by a state court prior to removal, requiring the petitioner to be deposed, was binding in federal court notwithstanding its inconsistency with federal discovery statutes. The Supreme Court rejected this argument. It initially noted that the predecessor statute of Section 1450 specifically authorized orders of a State court to remain in effect "until dissolved or modified by the Circuit Court." The Court construed this statutory language to afford the Circuit Court complete power over such orders which, it reasoned, could not "change or modify the express directions of an act of Congress on that subject." *Id.* at 725, 5 S.Ct. at 729. The Court thus concluded that:

> The petitioner having removed his case into the Circuit Court has a right to have its further progress governed by the law of the latter court, and not by that of the court from which it was removed; and if one of the advantages of this removal was an escape from this examination he has a right to that benefit if his case was rightfully removed.

*Id.* at 726, 5 S.Ct. at 730.

Both *Granny Goose* and *Ex Parte Fisk* clearly establish that this court has the statutory authority under Title 28 U.S.C. Section 1450 to modify or dissolve the protective order issued by the State Court. The next question that must be addressed is whether this court is required to apply state substantive law or federal law in evaluating the continued propriety of the protective order.

■ Protective orders are governed by *Fed.R.Civ.P.* 26(c) and are issued by a court for the protection of parties and witnesses during the discovery process. 8 Wright & Miller, *Federal Practice & Procedure,* Section 2035 at 260 (1979). It is settled that discovery in federal court is governed solely by the Federal Rules of Civil Procedure.[3] *See, Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); 8 Wright & Miller, *Federal Practice & Procedure,* Section 2005 at p. 28. The Federal Rules permit discovery of "any matter, not privileged, which is relevant to the subject matter ... and ... appears reasonably calculated to lead to the discovery of admissible evidence." *Fed.R.Civ.P.* 26(b)(1). Privileges asserted in federal cases are governed by *Federal Rule of Evidence* 501. That rule provides that whenever state law provides the rule of decision, the issue of privilege will be determined in accordance

---

3. Notwithstanding Tracey's claim that the protective order was based upon a state created substantive right to privacy, it is clear that the order was sought and obtained as a sanction for perceived discovery abuses. Thus the gravamen of Tracey's argument, as articulated at the Superior Court hearing on November 18, 1988, was that "First Atlantic Savings and Loan is improperly utilizing the records which it has in its possession, namely Mr. Tracey's bank accounts, to conduct informal discovery over what they feel are improprieties". [Tr. 11/18/88, p. 12]. Indeed, at that hearing, counsel for Tracey limited his request for relief to the issuance of "a protective order which precludes them from uti-

lizing any information which they may have obtained ... from Mr. Tracey's records without sending us a notice to produce, without sending a document demand, or anything of the sort, and to bar them from using that information in the future until they make a proper showing". [Tr. 11/18/88, p. 15]. Moreover, the sole basis for the Court's issuance of the protective order was its conclusion that "the bank has no business because they are a litigant in this lawsuit, to examine the records of plaintiff or counter-claimant without the usual discovery techniques". In short, the order was sought and issued as a sanction for failure to comply with state discovery procedures.

with state law. Since the parties have conceded that the material covered by the protective order pertains to state law issues, the New Jersey state law of privileges will apply. Thus, in considering First Atlantic's application to vacate the protective order; I may consider New Jersey state law only to the extent of determining whether or not the material covered by the order is subject to an evidentiary privilege. In this context I must determine whether or not New Jersey recognizes a right to financial privacy which establishes an evidentiary privilege as to customer bank records.

In support of the existence of such a right, Tracey cites *Brex v. Smith*, 104 N.J.Eq. 386, 146 A. 34 (Chan.1929), *State v. Hunt*, 91 N.J. 338, 450 A.2d 952 (1982) and *Canessa v. Kislak*, 97 N.J.Super. 327, 235 A.2d 62 (Law Div.1967).

Tracey's reliance on these cases, however, is entirely misplaced. None of these cases suggests the existence of a right to financial privacy precluding a bank from reviewing records in its possession, as envisioned by Tracey. *Brex v. Smith, supra,* for example, involved a criminal investigation by a county prosecutor who sought to inspect the bank records of all members of the Newark police department without disclosing the purposes for which he sought the information. The Chancery Court concluded that the prosecutor was not entitled to inspect the bank records without presenting any evidence of wrongdoing to a grand jury which itself could issue subpoenas for the documents.

The *Brex* court was clearly concerned with intrusive governmental conduct into the private affairs of individuals. As noted by the court, "[I]f the prosecutor can inspect the accounts of all policemen and their wives, what is to prevent him from making any investigation into any account of other individuals or classes which it may strike his fancy to delve into." *Id.* at 392, 146 A. 34.

Similarly, in *State v. Hunt*, the New Jersey Supreme Court addressed the constitutionality of a warrantless search and seizure of a criminal defendant's telephone billing records. The key issue before the court was whether an individual has a protectible interest in telephone billing records under the Fourth Amendment to the Federal Constitution, or Article I, paragraph 7 of the New Jersey Constitution. 450 A.2d at 954. Accordingly, the court's discussion was confined solely to the scope of constitutional protection against *governmental* intrusion.

While the court found a reasonable expectation of privacy in telephone billing, thus triggering *state* constitutional protection [4] there is no indication that the court equated the expectation of privacy to a common law right of financial privacy. Indeed, nowhere in its opinion did the *Hunt* court allude to the existence of a common law right of financial privacy. Nor is there any indication that the court considered the material to be privileged. Since both *Hunt* and *Brex* were predicated upon Fourth Amendment concerns which are wholly absent in the instant case, they simply provide no support for Tracey's position.

Finally, *Canessa v. Kislak, Inc.,* 97 N.J. Super. 327, 235 A.2d 62, cited by Tracey, involved an invasion of privacy claim against a real estate company for distribution of a newspaper article and picture of plaintiff for defendant's own commercial purposes. The principal issue before the court was whether the plaintiff's right of privacy claim constituted an "injury to the person" to which a two year statute of limitations would apply, or an "injury to property" to which a six year limitations period would apply. While the court recognized the existence of a right of privacy in a number of situations, there was no suggestion in the court's opinion that such a right operated to preclude a bank from reviewing records in its possession pertaining to a depositor.

---

4. The court recognized that toll billing records were not entitled to Fourth Amendment protection under the federal constitution. 450 A.2d at 954–55 citing *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 wherein the United States Supreme Court found no subjective expectation of privacy on behalf of the individual, and no societal recognition of such an expectation of privacy as reasonable.

Indeed, the existing New Jersey case law strongly suggests that bank records pertaining to a depositor belong exclusively to the bank and that a depositor does not possess any property interest in them. *See In re Addonizio*, 53 N.J. 107, 248 A.2d 531 (1968). In that case, a grand jury investigating allegations of corruption in city government served subpoenas on a bank and a brokerage house for production of the accounts of the mayor and his wife. The mayor and his wife moved to quash the subpoena contending that production would violate his Fourth Amendment rights. The New Jersey Supreme Court rejected the mayor's arguments holding that he did not have standing to raise the Fourth Amendment. The Court reasoned that:

> [t]he subpoenaed records are not his. This is true even though for some purpose the bank or the brokerage firm may be the agent of Addonizio, for the bank and the brokerage firm are independent entrepreneurs and the records are entirely their property. *Thus the subpoena touched nothing in which Addonizio had a property right.*

*Id.* at 131, 248 A.2d 531 (emphasis added).

■ In short, the most that can be said for Tracey's position is that he has a colorable argument that the New Jersey courts would recognize that a bank customer has a sufficient reasonable expectation of privacy in his account records to warrant protection against unreasonable governmental searches under the New Jersey Constitution.[5] Even if this were so, however, such protection would not rise to the level of an evidentiary privilege—since the material would be freely obtainable through the use of lawful process.

Having concluded that the account records are not privileged under New Jersey state law, it necessarily follows that state law may not be relied upon to uphold the protective order. I must now determine whether the order may be sustained under Federal law. I believe that it cannot. Tracey has failed to cite any federal statutory authority or case law which would support the imposition of the protective order in this case. Moreover, the Court's own research has failed to disclose any authority which supports the Superior Court's conclusion that a party to civil litigation may be barred from searching its own files for material relevant to its defense of a civil matter.

Indeed, the Supreme Court has strongly suggested that, at least as to bank records, it would reach a contrary conclusion. Thus, in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the court held that a bank depositor's account records did not fall "within a protected zone of privacy" for purposes of the Fourth Amendment. *Id.* In recording this conclusion, the Court noted:

> On their face, the documents subpoenaed here are not respondent's "private papers." Unlike the claimant in *Boyd*, [*v. U.S.*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746] respondent can assert neither ownership nor possession. Instead, these are the business records of the banks. As we said in *California Bankers Assn. v. Shultz*, supra, 416 U.S. [21] at 48–49, 94 S.Ct., [1494] at 1511, 39 L.Ed.2d, [812] at 833, "[b]anks are ... not ... neutrals in transactions involving negotiable instruments, but parties to the instruments with a substantial stake in their continued availability and acceptance." The records of respondent's accounts, like "all of the records [which are required to be kept pursuant to the Bank Secrecy Act,] pertain to transactions to which the bank was itself a party." [citation omitted]

*Id.* at 440–41, 96 S.Ct. at 1623.

Implicit in the above analysis is the Supreme Court's recognition that the bank, as the lawful owner and possessor of records maintained for the *bank's* business purposes, was fully entitled to use them for any legitimate purpose.

The Court also emphasized that any information contained in the bank's files was

5. Under federal law, the Right to Financial Privacy Act, 12 *U.S.C.* Section 3401 et seq. reflects a similar concern by restricting the circumstances under which government authorities may obtain account information from banks.

information voluntarily revealed by the customer—thus placing upon him the risk that it might be further disseminated. The Court stated:

> [c]hecks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business ...
>
> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. [citations omitted]

*Id.* at 442–43, 96 S.Ct. at 1624.

If, by voluntarily revealing his affairs to a bank, a customer takes the risk that the bank may disclose information to the government, it surely follows that he also takes the risk that the bank may use the same information to defend itself in a suit filed against it by the customer.

I therefore conclude that, to the extent there is any federal case law on the issue, it strongly supports the bank's position. Moreover, logic and common sense dictate a similar result. Any limitation on a bank's right to review its own records for its own legitimate business purposes would deprive it of a basic tool necessary to protect it and its customers from financial depradations. Banks would simply be unable to protect themselves from frauds, check kites, insider self dealing, and similar chicanery if they continually had to be concerned over whether or not they were authorized to examine the accounts of suspected wrongdoers. Such a limitation is simply insupportable.

It should be noted that the Superior Court's decision may be read as having a somewhat more limited rationale than the above discussion suggests. Language in the decision indicates that the Court may have merely concluded that once litigation commenced, the sole and exclusive means

by which the bank could review the account records was through Court sanctioned discovery processes. [Tr. 11/18/88, p. 17]. I find that the protective order cannot be sustained even on this more limited basis. To do so, I would have to accept the proposition that, merely by filing suit against his former employer Mr. Tracey had the power to cloak with special privacy and protection, material which, until the moment of filing, his employer had an absolute and unlimited right to inspect and review. This court simply cannot agree that a litigant, merely by commencing suit has the power to work such a startling transformation.

■ Moreover, even if this Court could agree that First Atlantic's conduct was procedurally deficient because it failed to use judicially approved discovery procedures prior to reviewing Mr. Tracey's accounts, it cannot agree that the sanction imposed was appropriate. Given the status of the law on this issue, a litigant would have had to have been clairvoyant to predict that such a procedure might be required. To bar First Atlantic from making any use of these records during the litigation because of its failure to successfully prognosticate that which was totally unforeseeable, is simply unjust.[6]

In sum, I conclude that neither legal authority, plain logic nor common notions of simple justice support the issuance of the protective order in this case.

## II. The Tax Returns, Interrogatories, and Document Requests

Mr. Tracey's argument against providing First Atlantic with the tax returns, documents, and information called for in First Atlantic's interrogatories is based solely upon the contention that they constitute "fruits of the poisonous tree" in that the requests were based upon information derived from Tracey's bank accounts. Since I have concluded that the protective order concerning these accounts must be vacated, Tracey's arguments concerning the inter-

---

6. This is particularly so in view of the fact that the records in dispute are the sort of material which is regularly obtained through discovery in Federal and State courts—as counsel for Mr. Tracey candidly conceded during oral argument before me.

rogatories and tax returns must perforce fail.

## CONCLUSION

Based upon the foregoing, I conclude that:

1) First Atlantic's application to vacate the state court's protective order must be granted;

2) First Atlantic's application to compel discovery of tax return information, documents and answers to outstanding interrogatories must be granted; and

3) Tracey's cross motion for a protective order must be denied.